UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
NATIONAL DAY LABORER ORGANIZING
NETWORK; ASIAN AMERICANS ADVANCING
JUSTICE – ASIAN LAW CAUCUS; and
IMMIGRATION JUSTICE CLINIC OF THE
BENJAMIN N. CARDOZO SCHOOL OF LAW,

              Plaintiffs,

    -against-                                     Civil Action No.:

UNITED STATES IMMIGRATION AND          **COMPLAINT FOR**
CUSTOMS ENFORCEMENT; UNITED STATES    **DECLARATORYAND**
DEPARTMENT OF JUSTICE; UNITED STATES    **INJUNCTIVE RELIEF**
DEPARTMENT OF HOMELAND SECURITY;
UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; UNITED STATES
CUSTOMS AND BORDER PROTECTION;
DEPARTMENT OF HOMELAND SECURITY'S
OFFICE OF CIVIL RIGHTS AND CIVIL
LIBERTIES; EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW; FEDERAL BUREAU
OF INVESTIGATION; DEPARTMENT OF
JUSTICE'S OFFICE OF INFORMATION
POLICY; and DEPARTMENT OF JUSTICE'S
OFFICE OF LEGAL COUNSEL,

              Defendants.
---------------------------------------------------------------- X

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

       All statements made herein are made upon information and belief except where the basis

of knowledge is specifically stated.

       1.      On November 20, 2014, the Department of Homeland Security ("DHS")

announced the launch of the Priority Enforcement Program ("PEP"), a large-scale deportation

dragnet program implemented by the federal government in collaboration with local law

enforcement authorities. The program serves as a successor to the "Secure Communities"

Program ("S-Comm"), which began in 2008 and was officially discontinued at the same time

DHS announced the launch of PEP. Yet, despite PEP's massive reach and the widespread public critiques of its predecessor program, and in the face of direct requests for the public disclosure of pertinent information, DHS, United States Immigration and Customs Enforcement ("ICE"), and other implicated federal agencies have divulged only extremely limited information concerning the development and implementation of PEP.

2.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, for declaratory, injunctive, and other appropriate relief to compel the release of agency records improperly withheld from Plaintiffs National Day Laborer Organizing Network ("NDLON"), Asian Americans Advancing Justice - Asian Law Caucus ("AAAJ-ALC"), and the Kathryn O. Greenberg Immigration Justice Clinic of the Benjamin N. Cardozo School of Law ("the Immigration Justice Clinic" or "the Clinic") (collectively "Plaintiffs"), by Defendants DHS, ICE, United States Department of Justice ("DOJ"), United States Citizenship and Immigration Services ("USCIS"), Executive Office for Immigration Review ("EOIR"), United States Customs and Border Protection ("CBP"), DOJ's Office of Information Policy ("OIP"), DOJ's Office of Legal Counsel ("OLC"), Federal Bureau of Investigation ("FBI"), and DHS's Office of Civil Rights and Civil Liberties ("CRCL") (collectively "Defendants").

3.      Plaintiffs bring this lawsuit because Defendants have failed to produce any meaningful records responsive to a FOIA request filed on March 5, 2015, and re-filed with certain Defendants on August 6, 2015, in an abundance of caution to ensure that the request encompassed records created or obtained more recently. Plaintiffs requested records regarding the termination of S-Comm and commencement and implementation of PEP. FBI and EOIR produced, collectively, only 35 pages of records, which revealed only information that was publicly available. DHS sent Plaintiffs only a hyperlink to an eight-page report and a hyperlink

to an internet page listing old, public DHS reports with data relating in some way to S-Comm. All other Defendants produced no records at all. Defendants have also failed to fulfill their statutory obligations to grant expedited processing and, excepting ICE, fee waivers for Plaintiffs' FOIA Request. 5 U.S.C. § 552 (a)(6)(E)(iii); 5 U.S.C. § 552(a)(4)(A)(viii).

4.     Immigration reform and deportation policies are now constantly and heavily debated in national and local arenas. Plaintiffs bring this lawsuit because of Defendants' failure to satisfy their statutory obligations to provide information about government activities and because of the pressing need to effectively inform and educate the public about immigration law enforcement policy and practice. Without knowledge about the federal government's immigration policy, the public cannot effectively engage in meaningful conversations about immigration reform, or respond to the federal government's assertions concerning its policies and practice. Defendants have shrouded their immigration law enforcement policies in secrecy, shielding themselves from any public accountability. Defendants' actions directly violate the central objectives of the FOIA.

5.     The urgency of Plaintiffs' FOIA Request must be evaluated in the context of the significant constitutional violations and public policy failures of PEP's predecessor program, S-Comm, the demise of which led to PEP's creation. Under S-Comm, ICE enlisted state and local law enforcement agencies nationwide to hold immigrants—the majority arrested for minor offenses and many never convicted of any crime—in local jails past their release date, in violation of their Fourth Amendment and due process rights. S-Comm also led to the illegal arrest of thousands of non-deportable immigrants and U.S. citizens. Another core feature of S-Comm carried forward into PEP was the redirection to DHS, for civil immigration enforcement

purposes, of millions of routine criminal fingerprint queries sent by local law enforcement agencies to the FBI.

6.      S-Comm devastated immigrant communities, led to widespread constitutional violations, and undermined public safety by driving a wedge between local communities and law enforcement. Over 350 localities, as well as the states of California and Connecticut, took steps to limit their involvement with the program. This public outcry and outright refusal to comply with S-Comm led DHS Secretary Jeh Johnson to announce the official termination of S-Comm and its replacement by PEP in a November 20, 2014 memorandum entitled "Secure Communities" (hereinafter, "PEP Memo").[1]

7.      DHS has acknowledged that the rebranding of the dragnet enforcement program as PEP was designed in part to win back the engagement of state and local actors who had opted out of S-Comm. PEP and S-Comm sport many similarities, and as a result, it is likely that S-Comm's defects persist and taint PEP's implementation and purpose. Yet it is impossible to fully evaluate the scale and breadth of PEP without the records sought in Plaintiffs' FOIA Request.

8.      Public release of this information is critical because ICE and other federal agencies are engaged in an aggressive campaign to convince states and localities to rejoin their immigration enforcement programs and implement PEP. Meanwhile, local communities lack the required information to independently determine the truth of the agencies' claims and make informed decisions about whether to opt in or out of the program or how to modify their implementation of the program. The public is effectively left out of crucial decisions about whether or how each jurisdiction should participate in PEP.

---

[1] Memorandum on Secure Communities from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to Thomas S. Winkowski, Acting Dir., U.S. Immigration and Customs Enforcement, et al. (Nov. 20, 2014).

9.      Moreover, as a result of PEP's implementation, a growing number of local law enforcement agencies are now transferring immigrants to ICE custody for immigration enforcement. Communities do not have the information to respond to what are ultimately mass deportations, or to know whether the program is being implemented in a manner consistent with federal policy and government assertions.

10.      Communities also need the requested information in order to respond to related immigration enforcement efforts—like the January 2016 nationwide home raids targeting Central American families who are *not* PEP priorities.[2] Details about PEP's design and implementation are necessary to understand the larger immigration enforcement context.

11.      Defendants have violated the FOIA by failing to produce responsive records within the statutory time limits. This failure is particularly egregious because it comes during a period in which the requested information is crucial for the public to meaningfully participate in a vigorous, ongoing debate about immigration policy.

## JURISDICTION AND VENUE

12.      This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 522(a)(6)(C)(i). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2).

13.      Venue lies in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(e) and 1402(a).

---

[2] *See e.g.*, Dara Lind, *The Nationwide Immigration Raids Targeting Central American Families, Explained*, Vox, http://www.vox.com/2015/12/28/10673452/deportation-central-american-immigrant-families (last visited Jan. 14, 2016).

## PARTIES

14.     Plaintiffs are two community-based and non-profit organizations and one university legal clinic. All three organizations regularly speak prominently and publicly about immigration law enforcement policies on the local, state, and national levels.

15.     Plaintiff NDLON is a non-profit organization founded in 2001 whose mission is to improve the lives of immigrant day laborers in the United States through nationwide advocacy and organizing efforts in coordination with 49 member organizations in 19 states. To this end, NDLON seeks to strengthen, connect, and expand the work of its member organizations to become more effective and strategic in building leadership and advancing issues around low-wage workers and immigrant rights. NDLON informs the public about immigrant rights issues, including deportation and enforcement policies, on a regular basis. NDLON frequently updates its publicly accessible catalogs of news items and other resources pertinent to these issues and also engages in daily discussions of such information with its members, many of whom are members of immigrant families and communities directly impacted by federal immigration enforcement policies. NDLON was also the lead plaintiff in the FOIA litigation pertaining to S-Comm, which resulted in the disclosure of essential information. *NDLON, et al. v. ICE, et al.*, No. 1:10-CV-03488 (S.D.N.Y. 2010). NDLON's main office and principal place of business is in Los Angeles, California.

16.     Plaintiff AAAJ-ALC is a non-profit organization founded in 1972 and is the nation's first legal and civil rights organization serving the low-income Asian and Pacific Islander communities. AAAJ-ALC has five program areas focused on housing rights, immigration and immigrant rights, labor and employment issues, civil rights and national security, and criminal justice reform. The mission of AAAJ-ALC is to promote, advance, and

represent the legal and civil rights of Asian and Pacific Islander communities. Recognizing that social, economic, political, and racial inequalities continue to exist in the United States, AAAJ-ALC is committed to the pursuit of equality and justice for all sectors of our society, with a specific focus directed toward addressing the needs of low-income, immigrant, and underserved Asians, Pacific Islanders, and other vulnerable communities. NDLON and AAAJ-ALC are among non-governmental organizational sponsors of the Trust Act, 2013 Cal. Stat. 4650 (codified at Cal. Gov't Code §§ 7283-7282.5), a California state law that went into effect in California on January 1, 2014, and limits detentions in response to ICE detainer requests. AAAJ-ALC informs the public about immigrant rights issues, including deportation policies, on a regular basis. AAAJ-ALC frequently updates their publicly accessible catalogs of news items and other resources pertinent to these issues and engages in daily dissemination of such information with their clients, many of whom are members of immigrant families and communities directly impacted by federal immigration enforcement policies. Moreover, AAAJ-ALC's immigration program primarily defends immigrants in deportation proceedings, many of whom are considered priorities under PEP. AAAJ-ALC's office and principal place of business is in San Francisco, California.

17.     Plaintiff Immigration Justice Clinic represents individuals facing deportation, as well as community-based organizations, in both public policy and litigation efforts. The Clinic has established itself as a leader in the dissemination of critically important information about immigration enforcement operations to the public. In February 2009, the Clinic disseminated previously unavailable memoranda and data obtained through FOIA litigation related to ICE

home raid operations, resulting in widespread national media coverage.[3] In July 2009, the Clinic published the first public study of ICE's home raid operations, playing a critical role in informing the public of pervasive constitutional violations and other abuses, again attracting significant national media attention. These materials are freely available to the public on the Clinic's website. The Clinic was also a party to the aforementioned FOIA litigation pertaining to S-Comm. The Clinic's office and principal place of business is in New York, New York.

18. Defendant DHS is a Department of the Executive Branch of the U.S. government. Defendants ICE, USCIS, CBP, and CRCL are components of DHS. Each is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). Each agency is involved in the organization and implementation of PEP. DHS is responsible for, among other things, border security and the administration of immigration laws. DHS, along with ICE, is principally responsible for the establishment and implementation of PEP. The President tasked the DHS Secretary and the U.S. Attorney General with the review of immigration enforcement, which prompted DHS Secretary Johnson to announce PEP's launch in the November 20, 2014 PEP Memo. The PEP Memo ended S-Comm, announced PEP's implementation, outlined PEP's core elements and contours, and tasked various governmental agencies and actors to implement PEP. DHS committed itself to "monitor these activities [related to transfers into DHS custody] at the state and local level, including through the collection and analysis of data, to detect inappropriate use to support or engage in biased policing, and [to] establish effective remedial measures to stop any such misuses."[4] Jeh Johnson directed DHS's Assistant Secretary for Intergovernmental Affairs "to formulate a plan and coordinate [its] effort to engage state and local governments" under PEP.

---

[3] *See* Nina Bernstein, *Report Says Immigration Agents Broke Laws and Agency Rules in Home Raids*, N.Y. Times, July 21, 2009, at A20; Editorial, *Run Amok*, N.Y. Times, July 27, 2009.
[4] PEP Memo at 3.

19.     On the same day he issued the PEP Memo, Secretary Johnson directed a memo entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants" (hereinafter, "Priorities Memo"),[5] which elaborates on PEP and the new DHS immigration enforcement priority regime, to the heads of ICE, CBP, and USCIS. In the Memo, Secretary Johnson states that ICE, CBP, and USCIS are "responsible for enforcing the nation's immigration laws." The Priorities Memo assigns the ICE Field Office Directors, CBP Sector Chiefs and Directors of Field Operations, and USCIS District Directors or Service Center Directors the responsibility to determin[e], according to DHS guidelines, whether individuals are "enforcement priorit[ies]" or, instead, should not be subject to removal. The Priorities Memo further tasks ICE, CBP, and USCIS to cooperate with the Office of Immigration Statistics to collect and report data to the Secretary to ensure compliance with DHS policy.

20.     United States Immigration and Customs Enforcement is responsible for criminal and civil enforcement of federal immigration laws and conducts much of DHS's enforcement that targets individuals living within the interior of the United States. ICE, along with DHS, is principally responsible for the establishment and implementation of PEP. In the PEP Memo, Secretary Johnson specifically directed ICE to end S-Comm and implement PEP and delineated the circumstances under which ICE should seek to take people into DHS custody.

21.     United States Citizenship and Immigration Services oversees lawful immigration to the United States. Among its other roles, it manages all "alien files," which contain millions of individuals' immigration-related records. The Priorities Memo specifically tasks USCIS District Directors to exercise their discretion in prioritizing individuals for removal, to assess factors

---

[5] Memorandum on Policies for the Apprehension, Detention and Removal of Undocumented Immigrants from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to Thomas S. Winkowski, Acting Dir., U.S. Immigration and Customs Enforcement, et al. (Nov. 20, 2014).

indicating whether an individual is "a threat to national security, border security, or public safety," to decide whether an individual is not otherwise an enforcement priority, and to assess whether an individual may be eligible for a form of relief.

22.    United States Customs and Border Protection implements PEP and other immigration enforcement policies at all ports of entry and within 100 miles of all U.S. borders. The Priorities Memo specifically tasks CBP Sector Chiefs and Directors of Field Operations to exercise their discretion in accordance to the Priorities regime and to cooperate with efforts to collect data tracking this.

23.    DHS's Office of Civil Rights and Civil Liberties supports DHS's "mission to secure the nation while preserving individual liberty, fairness, and equality under the law," and includes a Compliance Branch, an Anti-Discrimination Branch, and a Programs Branch. CRCL is specifically tasked with certain review and oversight duties regarding PEP. DHS Secretary Johnson directed the memorandum launching PEP, and describing its contours, to the head of ICE and the CRCL Officer and Assistant Secretary for Intergovernmental Affairs. In launching PEP and ending S-Comm, Secretary Johnson directed CRCL to "develop and implement a plan to monitor state and local law enforcement agencies participating in [transfers of individuals from cooperating state and local law enforcement to ICE custody]." DHS tasked CRCL with assisting in monitoring and investigating PEP, including by reviewing requests to transfer individuals into ICE custody, investigating possible misuse of PEP by local law enforcement officials, communicating with ICE, and engaging in regular meetings and notifications with DHS and other authorities.[6]

---

[6] *See* Dept. of Homeland Security, "Monitoring and Addressing Civil Rights and Civil Liberties Concerns Arising from Transfers from State or Local Law Enforcement Custody," http://www.dhs.gov/sites/default/files/publications/crcl-ice-pep-247-final.pdf.

24.     Defendant United States Department of Justice is a Department of the Executive Branch of the U.S. government. Defendants FBI, OLC, EOIR, and OIP are components of DOJ. Each is an "agency" within the meaning of 5 U.S.C. § 552(f)(1), and each agency is involved in the organization and implementation of PEP. DOJ is responsible for overseeing immigration enforcement and adjudication policies, including PEP. The U.S. Attorney General is the head of DOJ. The President tasked the DHS Secretary and the U.S. Attorney General with the review of U.S. immigration enforcement, which led to PEP's launch.

25.     The Federal Bureau of Investigation enforces U.S. criminal laws. It manages the fingerprint databases central to PEP, including the Integrated Automated Fingerprint Identification System ("IAFIS") and other biometric identification systems. Through IAFIS, the FBI transmits fingerprints that it obtains from local law enforcement to ICE to check immigration-related information, and this core component of S-Comm appears to remain the same under PEP. The FBI also maintains other relevant databases and information-sharing systems, including Intelligence Information Reports and Intelligence Bulletins, which "share information on significant criminal or national security developments or trends of interest to the intelligence and law enforcement communities." The FBI is also in charge of other situational information-sharing reports that apply national-level intelligence at the local level.

26.     The DOJ's Office of Legal Counsel provides authoritative legal opinions to the President and Executive Branch agencies. OLC also reviews all proposed orders of the Attorney General and regulations requiring the Attorney General's approval. At the request of the DHS Secretary and Counsel to the President, OLC prepared a memorandum prior to PEP's launch concerning legal questions pertinent to PEP and the prioritization of immigrants for enforcement actions.

27.     The Executive Office for Immigration Review administers the nation's immigration court proceedings, including appellate reviews by the Board of Immigration Appeals and administrative hearings in Immigration Court. EOIR oversees all hearings related to deportation and potential immigration relief, including those initiated as a result of PEP, and in which PEP "enforcement priorities" apply.

28.     The DOJ's Office of Information Policy is in charge of the DOJ's administrative and policy responsibilities under the FOIA, and promotes government-wide compliance with the Act. OIP is the DOJ's component agency in charge of maintaining the documents of certain DOJ offices, including the Attorney General, Deputy Attorney General, Associate Attorney General, and Offices of Legislative Affairs. These DOJ offices evaluate and implement elements of immigration policy. OIP's records stored through this role contain important information related to immigration enforcement and adjudication policies, including PEP.

## STATEMENT OF FACTS

**I.     Defendants Are Implementing PEP as a Major—and Concerning—New Immigration Enforcement Program.**

29.     PEP is a federal immigration enforcement program that identifies people for deportation at the time of booking by state and local law enforcement agencies. Through PEP, fingerprint-based biometric data sent by state and local law enforcement agencies (LEAs) to the FBI for routine criminal background checks are also forwarded to DHS to perform immigration background checks. This occurs countless times each day. Under PEP, where the background checks produce a "match," ICE may request LEAs to notify ICE about the individual's anticipated release date, detain the individual beyond that release date for the purpose of immigration enforcement, or transfer them to ICE custody for removal proceedings. PEP succeeds the now-defunct S-Comm, a program which similarly relied on such collaboration

between federal immigration authorities and LEAs for immigration enforcement, and which was discontinued in light of widespread concern over constitutional violations, disruption of community trust in law enforcement, and other problems. In its design and implementation, PEP triggers concerns similar to those S-Comm caused. Nonetheless, DHS and other federal agencies are currently engaged in an aggressive nationwide effort to encourage the implementation of PEP at the state and local levels even though the public has had access to very little information about PEP to date.

### A. DHS Discontinued Secure Communities in the Face of Mounting Constitutional and Other Concerns.

30.     PEP replaced S-Comm, a program that suffered from mounting criticisms and had been found constitutionally deficient in important respects. DHS Secretary Johnson acknowledged that he discontinued S-Comm and replaced it with PEP in response to these legal and other challenges.

31.     S-Comm began in 2008 and was implemented nationwide by 2013. Under S-Comm, the fingerprints of every person arrested by any law enforcement agency in the country were run through ICE's immigration database, regardless of whether the person was subsequently convicted of any crime. If ICE suspected the person might have committed immigration violations, it would send a detainer request asking the LEA to hold the person in jail beyond the time when she would have been released in order to give ICE time to consider whether or not to initiate immigration enforcement actions.

32.     Through detainer requests issued under S-Comm, ICE asked that LEAs hold individuals for up to 48 hours, not including weekends and holidays, "beyond the time when the subject would have otherwise been released" from custody. ICE issued detainer requests—and LEAs acted on them—without a warrant, the approval of a magistrate, or a showing of probable

cause that an individual was removable from the United States. Relying on ICE detainers, under S-Comm, LEAs held tens of thousands of people in detention each year past their expected date of release.

33.     Through S-Comm, LEAs played a crucial frontline role in the deportation of immigrant community members, leading to a public outcry about the entanglement of police and sheriffs with ICE for the purpose of civil immigration enforcement. Numerous studies found that S-Comm had undermined immigrant communities' willingness to trust police. For example, a 2013 report by the University of Illinois – Chicago found that immigrant victims of crime, including domestic violence, were less likely to call the police for fear that interaction with the police could lead to an inquiry into their immigration status and potential deportation.[7]

34.     ICE frequently claimed that S-Comm focused on the deportation of individuals who had been convicted of what DHS and ICE labeled "serious" crimes. But as defined by ICE, "serious" crimes included minor misdemeanors. Moreover, the agency did not even follow its overbroad priorities. Rather, ICE often issued detainers for people who were only charged with a crime, whether or not they had been convicted, as well as people whose only offenses were minor traffic violations. While senior ICE officials issued several memoranda concerning the prioritization of deportations, ICE agents repeatedly failed to follow those directives, resulting in mass deportations regardless of whether factors would have favored prosecutorial discretion under ICE's own policy prescriptions. As a result, S-Comm led to the indiscriminate detention and deportation of hundreds of thousands of people, many of whom did not fall under ICE's priority scheme, and even to the immigration detention of some U.S. citizens.

---

[7] Nik Theodore, Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement, U. of Ill. at Chi., Dep't of Urb. Plan. & Pol'y (May 2013), https://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF.

35.     Many individuals, including people whose family members depended upon them for financial and emotional support, were deported without regard to the significant community and family ties they had in the United States. S-Comm left many immigrant communities more impoverished and disempowered by tearing away community members without regard to their local ties or their roles as family members, breadwinners, friends, workers, and community or religious leaders.

36.     For years, S-Comm also suffered from a lack of transparency, including about whether localities could opt into or out of the program. Eventually, only after litigation initiated by NDLON, the Immigration Justice Clinic, and the Center for Constitutional Rights, thousands of records were released that revealed essential information about S-Comm.

37.     Several federal courts ultimately held that ICE detainers are unconstitutional, in violation of the Fourth Amendment and the Due Process Clause.[8] Not only were law enforcement agencies opening themselves up to liability and civil suits, they were expending their resources on civil immigration enforcement. This entanglement between LEAs and ICE fostered fear and distrust in immigrant communities.

38.     As a result of growing pressure from the prospect of civil liability, and of concern about S-Comm's effect on police-community relations, hundreds of LEAs adopted policies to

---

[8] *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 211 (1st Cir. 2015) (concluding that detention pursuant to an immigration detainer for investigation violated the Fourth Amendment); *Galarza v. Szalczyk*, 745 F.3d 634, 645 (3d Cir. 2014) (local law enforcement agency could not excuse its detention of an individual without probable cause based on its receipt of a detainer from ICE); *Mendoza v. Osterberg*, No. 13-65, 2014 WL 3784141, at *6 (D. Neb. July 31, 2014) (recognizing that "[t]he Fourth Amendment applies to all seizures of the person," and thus, "[i]n order to issue a detainer[,] there must be probable cause") (internal quotation marks, ellipses, and citations omitted); *Villars v. Kubiatowski*, 45 F. Supp. 3d 791, 807-08 (N.D. Ill. 2014) (holding that plaintiff stated a Fourth Amendment claim where he was held on an ICE detainer that "lacked probable cause"); *Miranda-Olivares v. Clackamas County*, No. 3:12–cv–02317, 2014 WL 1414305 (D. Ore. Apr. 11, 2014) (holding that plaintiff's detention on an ICE detainer after she would otherwise have been released "constituted a new arrest, and must be analyzed under the Fourth Amendment").

limit compliance with ICE detainers. As of 2015, over 350 jurisdictions throughout the nation, including New York City, Cook County (Chicago), Philadelphia, San Diego, Baltimore, King County (Seattle), Newark, Milwaukee, and Denver, in addition to the states of California and Connecticut, had implemented laws and policies limiting compliance with ICE detainers.

39.     In June 2011, the Homeland Security Advisory Council established a Task Force on Secure Communities to examine the flawed program. The Task Force concluded that "ICE must improve the transparency of the program;" that "DHS must exercise its prosecutorial discretion, in all its immigration enforcement endeavors, in line with stated enforcement priorities, and take systematic steps to train and monitor field officers and attorneys as they implement Departmental policies on prosecutorial discretion;" and that "DHS must strengthen accountability mechanisms, including remedies for and prevention of civil rights and civil liberties violations."[9]

40.     In his memorandum announcing the termination of S-Comm and the creation of PEP, Secretary Johnson conceded that S-Comm had become "a symbol for general hostility toward the enforcement of our immigration laws." Recognizing that "[g]overnors, mayors, and state and local law enforcement officials around the country ha[d] increasingly refused to cooperate with the program, and many ha[d] issued executive orders or signed laws prohibiting such cooperation" and that "[a] number of federal courts have rejected the authority of state and local law enforcement agencies to detain immigrants pursuant to federal detainers issued under the current Secure Communities program," DHS Secretary Johnson officially terminated S-Comm.

---

[9] Homeland Security Advisory Council, Task Force on Secure Communities Findings and Recommendations at 9-10 (Sept. 2011), *available at* https://www.dhs.gov/xlibrary/assets/hsac-task-force-on-secure-communities-findings-and-recommendations-report.pdf.

**B. PEP Does Not Resolve the Serious Concerns Raised about the Federal Government's Immigration Enforcement Policies and Practices under S-Comm.**

41.     PEP has officially replaced S-Comm, but it appears to perpetuate many of the pervasive problems and legal deficiencies at S-Comm's core. Both programs still result in the issuance of immigration detainers, and both fail to provide judicial probable cause findings to support these requests for detention. Both programs entangle LEAs with federal civil immigration enforcement responsibilities, in conflict with the recommendation of the President's Task Force on 21st Century Policing to "decoupl[e]" federal immigration enforcement and local policing. Both programs were implemented without meaningful transparency or oversight. And, in practice, both programs have run significantly afield of their stated priorities.

42.     Pursuant to PEP, ICE enlists LEAs to support federal authorities in federal civil immigration enforcement, as the S-Comm program did previously. Through PEP, DHS and the FBI share data concerning criminal history records, which are maintained by the FBI in its Integrated Automated Fingerprint Identification System ("IAFIS"), and federal immigration records maintained by DHS in its Automated Biometric Identification System ("IDENT"). Routine fingerprint checks conducted by LEAs upon any arrest or booking pass through these federal integrated databases. Under S-Comm and PEP, the FBI databases match the arrestee's fingerprints upon arrest to a civil immigration database and ICE is automatically notified. If ICE decides to pursue the transfer of an individual to ICE custody, ICE asks the LEA to hold the individual, possibly past her release date, in order for ICE to detain her, or asks the LEA to notify ICE of the individual's release date or otherwise facilitate her transfer into ICE custody.

43.     DHS Secretary Johnson asserted in the November 20, 2014, PEP Memo that PEP would attempt to prioritize for removal immigrants who fall into one of certain specified DHS "Civil Immigration Enforcement Priorities" (hereinafter "PEP Priorities."). The PEP Memo

instructs ICE officers to exercise discretion to *not* seek the transfer of an individual from LEA to ICE custody *unless* she falls into one of two categories. "Priority 1" individuals are those who "pose a danger to national security" or who have been convicted of a felony, an "aggravated felony" under the Immigration and Nationality Act, or an "offense for which an element was active participation in a criminal street gang." "Priority 2" individuals are those who have been convicted of multiple misdemeanors or a "significant" misdemeanor.

44.     The Priorities Memo, released on the same day as the PEP Memo, elaborates on the PEP Priorities. The Priorities Memo creates additional, *broader* priority enforcement categories for deportation, including the priorities for overall immigration enforcement efforts. For example, the Priorities Memo states that individuals who were issued final orders of removal on or after January 1, 2014, "should generally be removed." However, these individuals should not be subject to enforcement under the PEP priorities.

45.     Under PEP, ICE issues at least three different types of requests to LEAs. First, ICE issues "notification requests," which ask that LEAs notify ICE when individuals suspected of being "priorities for removal" will be released from custody (Request for Voluntary Notification of Release of Suspected Priority Alien, or I-247N). Second, ICE issues "detainers" which ask LEAs to detain individuals beyond their expected release date in anticipation of a transfer to ICE custody (Immigration Detainer - Request for Voluntary Action, or I-247D). Third, via a form released in December, 2015, ICE issues "transfer requests," which ask LEAs to transfer to ICE individuals who are suspected to be an "immigration enforcement priority," whether or not the individuals fall into any priority identified in the PEP Memo (Request for Voluntary Transfer, or I-247X).

46.     The PEP Memo calls for the use of notification requests, rather than detention requests, absent "special circumstances." The PEP Memo requires DHS, in these "special circumstances," to specify that the individual subject to the detention request is subject to "a final order of removal" or that there is "other sufficient probable cause to find that the person is a removable alien." However, the I-247D form used to seek such detention beyond individuals' scheduled release dates makes no mention of the "special circumstances" requirement set by the PEP Memo.

47.     The Request for Voluntary Transfer form was apparently designed to be issued for individuals potentially subject to transfer from LEA to ICE custody even when they do not clearly fall into any of the enumerated PEP "priority" categories. ICE uses I-247X forms to request the transfer of individuals "*suspect[ed]*" to be a priority either because: (1) they were "apprehended at the border" or arrived in the United States after 2014; (2) they "significantly abused the visa or visa waiver programs;" (3) they were subject to final removal orders issued in or after 2014; or because (4) their removal would satisfy an undefined, potentially sweeping "important federal interest" (emphasis added). Some of these categories are identified in the Priorities Memo, but were explicitly precluded as reasons for transfer in the PEP Memo.

48.     While the notification, detainer, and transfer forms all are intended to facilitate a transfer of custody from LEAs to ICE, none is based on a judicial determination of probable cause. Accordingly, the new forms do not cure the legal deficiencies of prior immigration detainer forms, found by multiple courts to violate the Fourth Amendment. The new detainer form, Form I-247D, merely provides a checkbox for an individual ICE agent to mark, stating that she has probable cause to support a detainer request; it lacks any requirement that the agent describe the basis for the probable cause.

49.     The forms also undermine important due process principles. While the I-247D form asks LEAs to serve a copy on the person subject to the detainer, it appears that DHS will still detain and seek to deport the individual even if the LEA fails to serve a copy of the form as instructed. Further, the I-247N form does not even ask LEAs to notify detainees that they are subject to a DHS request, and the I-247X form only asks LEAs to notify detainees of the request if the form includes a specific request for detention beyond the detainee's scheduled release.

50.     DHS suggests that the major differences between PEP and S-Comm include the use of notification requests and a more targeted focus on deportable aliens within DHS's priorities. However, the PEP and Priorities Memos include cavernous exceptions that undermine the existence of their supposedly narrower "enforcement priorities." While these new priorities are harsh, DHS does not even commit to follow them. The Priorities Memo provides, for instance, that "nothing . . . should be construed to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities." The PEP Memo similarly provides that as long as an LEA agrees to participate, "nothing in [the] memorandum shall prevent ICE from seeking the transfer of an alien . . . when ICE has otherwise determined that the alien is a priority."

51.     Neither the notification nor the transfer form requires that DHS conclude that an individual fall into one of the enforcement priorities; DHS must only assert that it "*suspects* . . . that the subject is an immigration enforcement priority" (emphasis added).

52.     In practice, since PEP was implemented, DHS has used the program to initiate enforcement action against numerous individuals who do not satisfy even the broad priorities set in the PEP and Priorities Memos. Early data show that a disproportionate number of those subject to PEP detainers have no criminal convictions, would not meet the "special

circumstances" outlined in the PEP Memo, and do not otherwise meet the criteria outlined in the PEP Memo.[10]

53.     Further, PEP, like S-Comm, continues to encourage racial profiling. Because any arrest—regardless of its outcome—leads to an immigration background check, officers may make baseless seizures in order to precipitate immigration enforcement. In one example, documented by the New Orleans Workers' Center for Racial Justice, which filed a related CRCL complaint, Louisiana police arrested and detained for loitering two men waiting for a ride to work. Later e-mail correspondence obtained from DHS revealed that the men were arrested for looking Latino: "The only basis for the arrest seems to have been to give Border Patrol an opportunity to run an immigration investigation."[11] Even after CRCL recommended releasing the men—who were not threats to public safety and had been victims of civil rights violations—ICE deported one of them and has yet to commit not to deport the other. This case and others demonstrate PEP's contribution to racial profiling by facilitating arrest under false pretenses, for the purpose or with the effect of checking immigration status, transfer to ICE custody and eventual deportation without accountability even in conflict with DHS policy.

54.     Finally, following the lack of transparency that characterized S-Comm, the PEP and Priorities Memos leave key terms undefined. For example, the PEP Memo provides that ICE may issue a request for detention if a person presents a "demonstrable risk" to national security, and then only in "special circumstances." The Priorities Memo classifies someone an immigration enforcement priority if she has "significantly abused" visa or visa waiver programs,

---

[10] Transactional Records Access Clearinghouse, *Further Decrease in ICE Detainer Use: Still Not Targeting Serious Criminals*, Aug. 28, 2015, at http://trac.syr.edu/immigration/reports/402/.
[11] Email from Megan Mack, CRCL Officer, to Sarah Saldaña, ICE Director, Sept. 21, 2015, *available at* http://nowcrj.org/wp-content/uploads/2015/10/ERO-Prosecutorial-Discretion-Inquiry-emails.pdf. *See* New Orleans Workers' Center for Racial Justice, *ICE Deports Man at Center of Civil Rights Exposé*, Oct. 20, 2015, http://nowcrj.org/2015/10/20/ice-deports-man-at-center-of-civil-rights-expose-10-20-15/.

and this phrase appears in Form I-247X. Under the Priorities Memo, "compelling and exceptional factors," or simply "factors," may support prosecutorial discretion where an immigrant might otherwise be an enforcement priority, but there is no clarity regarding such factors, nor which type of consideration might be overriding. Form I-247X creates an expansive category of individuals subject to transfer for immigration enforcement where a transfer "serve[s] an important federal interest," but this term is also not defined. Notably, because "important federal interest" remains undefined, CRCL may be unable to effectively carry out its task of monitoring the use or abuse of this form without understanding what exact reason DHS alleges justifies holding an individual past his release date. Further, since ICE Director, Sarah Saldaña, announced that all ICE agents were to undergo an online training on Form I-247X by December 11, 2015, it remains unclear how the agents will be trained in implementing this form, how they will implement it in practice, and how they will interpret its numerous indefinite terms.

### C. The Federal Government Is Engaged in an Aggressive Effort to Secure Local Support for, and Implementation of, PEP.

55.     DHS and ICE are engaged in aggressive outreach with LEAs nationwide—many of whom had rejected S-Comm—to persuade them to participate in PEP by complying with notification, detention, and transfer requests. In many jurisdictions, ICE is also seeking full access to jails, including access to inmates for questioning and access to jail databases to peruse detainee records. DHS touts LEAs' compliance with PEP, and the shifting local policies, stating, "[o]f note, 16 of the top 25 jurisdictions with the largest number of previously declined detainers are now participating in PEP, representing 47 percent of previously declined detainers."[12]

---

[12] Dept. of Homeland Security, *DHS Releases End of Fiscal Year 2015 Statistics, Dec. 22, 2015*, at http://www.dhs.gov/news/2015/12/22/dhs-releases-end-fiscal-year-2015-statistics.

56.     Such negotiations are ongoing and are reflected in recent and imminent decisions by sheriffs' departments and other law enforcement agencies across the nation regarding whether to opt into or out of PEP and to what extent they will cooperate with ICE in enforcing civil immigration laws. One jurisdiction, Philadelphia, Pennsylvania, signed onto PEP on December 22, 2015, prompting praise from DHS Secretary Johnson who categorized PEP as "a common-sense approach to our immigration system" and predicted that "additional jurisdictions will agree to work with PEP in the coming weeks and months." Fifteen days later, however, Philadelphia opted out of PEP when, within hours of being sworn in, Philadelphia's new mayor issued an Executive Order that ended the city's cooperation with PEP and instead limited the group of people whom Philadelphia would transfer from jails to ICE custody.

57.     Los Angeles County's debate about participation in PEP further shows that the decision to opt into or out of PEP is ongoing, contentious, and based on limited information. In May 2015, the L.A. County Board of Supervisors voted to opt out of allowing ICE agents to speak to inmates they believed were foreigners. In response to concerns of racial profiling, it voted to close ICE offices in the jail, and adopted a "wait-and-see" policy on what PEP would look like before making a definitive decision. Sheriff Jim McDonnell, in September 2015 and following a series of "record-setting" ICE home raids, announced a new policy opening the jails to ICE agents, allowing ICE agents to interview people in the jails, and granting ICE "access to all inmates who are being released," but limiting detainers and transfers for the purposes of immigration enforcement.[13] ICE and the Sheriff's Department have provided only very limited information about PEP implementation in Los Angeles, even in response to months-old Los Angeles-specific public records requests directed at both ICE and the LEA.

---

[13] *See* Kate Linthicum, *Immigration Agents Allowed back in L.A. County Jails, with Limits*, L.A. Times, Sept. 23, 2015, http://www.latimes.com/local/lanow/la-me-ln-ice-los-angeles-jails-20150922-story.html.

58.     San Francisco is another jurisdiction currently deciding whether or not to implement PEP. Newly sworn-in Sheriff Vicki Hennessy is actively developing a policy about whether and to what extent San Francisco will participate in PEP.[14]

59.     These decisions are happening now behind closed doors. The public has had limited ability to offer input into the implementation of PEP in their localities due to the government's lack of transparency and has thus been limited in monitoring ICE's presence in their communities. The lack of transparency amid the ongoing debates and imminent decisions about PEP implementation warrant expedited processing of Plaintiffs' Request.

60.     Despite the lack of publicly available information about PEP, and without investigating the program's legality and impact on localities, Congress has considered, and threatened to introduce again in the near future, legislation that would deny substantial federal funding to any state and local government that chooses not to participate in ICE's enforcement programs, including PEP.[15]

61.     All signs indicate that Congress is unlikely to make progress on comprehensive immigration reform in the near future. This heightens the importance of public disclosure concerning PEP's implementation, as PEP constitutes the defining program outlining the government's priorities for deportation and the processes by which individuals arrive in federal custody for the purpose of immigration enforcement.

## II.     Defendants Have Provided the Public with Virtually No Information and Allowed Insufficient Oversight over PEP.

62.     Defendants have released very little public information about PEP, even though it has a significant impact on the public through its ostensible overhaul of immigration

---

[14] *See* Vivian Ho, *New S.F. Sheriff to Reverse Ban on Communicating with Immigration*, S.F. Gate, Jan. 12, 2016, http://www.sfgate.com/bayarea/article/New-S-F-sheriff-to-reverse-ban-on-communicating-6754468.php.
[15] *See* Stop Sanctuary Policies and Protect Americans Act of 2015, S. 2146, 114th Cong. (2015).

enforcement as well as, more broadly, entanglement with state and local law enforcement. Jurisdictions cannot make informed decisions about whether or how to engage with PEP without greater information. Nor can members of the public provide input into these critical decisions.

63.     Defendants have publicly released minimal official documents concerning PEP. The publicly-available information defining PEP, at the time of the filing of this complaint, consists essentially of the two DHS memoranda released at the launch of the program (PEP Memo and Priorities Memo); an OLC legal memo prepared prior to the program's launch concerning immigration enforcement priorities; the three forms used for requests for notification, detention and transfer (I-247N, I-247D, and I-247X, respectively); and a brochure and slides produced by ICE's Office of Enforcement and Removal Operations detailing purported differences between PEP and S-Comm. Other related publicly-available information released over the past year includes an undated two-page DHS memo outlining a barebones process for "monitoring and addressing civil rights and civil liberties concerns;" a three-page EOIR memorandum concerning immigration court operating policies and procedures in light of PEP, immigration enforcement priorities and prosecutorial discretion; and online "frequently asked questions." The records released are sparse given the significance of the program and do not permit the public to engage in an independent analysis of PEP.

64.     Defendants have not publicly produced any briefings, manuals, trainings, or instructional guidelines to explain PEP's standards, if or how they differ from S-Comm, and how they should be implemented in practice. Defendants have not clarified when ICE issues a notification, detainer, or transfer request, nor when it will exercise prosecutorial discretion. Defendants have not demonstrated how the issuance of detainers or notification requests satisfies probable cause requirements in the face of multiple court judgments finding that Defendants'

comparable practices under S-Comm violated the Constitution. The PEP and Priorities Memos call for data to be produced, monitored, and released to the public, but only very limited data has been released, and it does not reveal meaningful improvements on S-Comm. Detailed data that would permit the sort of thorough monitoring for abuses through PEP that DHS's memoranda suggest, such as monitoring for racial profiling by LEAs, have not been released publicly.

65.     Defendants similarly refused to release substantial information about S-Comm until compelled by litigation. The results of that litigation show that disclosure of information concerning federal immigration enforcement is essential to state and local decision-making. The release of records related to S-Comm spurred strong public opposition to the program, with the result that over 350 jurisdictions restricted their cooperation with S-Comm and the program was ultimately disbanded. Without the information needed to understand and assess PEP, and without the benefit of public debate based on full, transparent release of relevant records, LEAs and the communities they serve are being pressured to make the decision to cooperate with PEP without full consideration of how the program operates and what its impact on local communities will be.

## III.   Plaintiffs Requested Information Concerning PEP Over Ten Months Ago, but Have Received Virtually No Responsive Records.

66.     As a crucial element of Plaintiffs' ongoing efforts to engage both the public and the government in an open debate about immigration reform, on March 5, 2015, Plaintiffs sent Defendants a request for the disclosure of records related to the termination of S-Comm and the implementation of PEP as its replacement. Plaintiffs requested records related to policies, procedures, and objectives; data and statistical information; agency communications concerning PEP; individual records needed to compile important data; PEP's fiscal impact; assessments of

PEP; complaint mechanisms and oversight of PEP; and the date of implementation of PEP.[16] Such information is necessary to assess current federal immigration enforcement practices and to engage in informed debate about PEP's implementation.

67.     Plaintiffs' FOIA request was modeled after a prior FOIA request, filed in 2010 by two of the Plaintiffs along with the Center for Constitutional Rights, relating to S-Comm. That request was ultimately successful after litigation was initiated. The S-Comm FOIA request led to the eventual production of thousands of responsive documents, which provided valuable information essential to communities' ability to understand and, where necessary, challenge S-Comm. This transparency, a product of a FOIA request similar to Plaintiffs' request here, permitted debate that led to the government's 2014 decision to terminate S-Comm. Plaintiffs thus believed this similar Request to be within the Defendants' capacities to manage and to encompass many types of records in Defendants' possession.

68.     Furthermore, Defendants' withholding from the public of information about PEP forced Plaintiffs to file a comprehensive FOIA request to avoid the need for subsequent requests. The urgent need for information about PEP, particularly by the numerous communities currently deliberating the extent and nature of their cooperation with PEP, led Plaintiffs to file a single comprehensive FOIA request seeking the full scope of pertinent information about PEP in lieu of numerous smaller FOIA requests and in the interest of efficiency.

69.     Defendants have provided only a negligible response, and, in many cases, no response at all, more than ten months after Plaintiffs' initial requests. In violation of their

---

[16] See Exhibit A, FOIA Request submitted to ICE ("FOIA Request"). The requests Plaintiffs submitted to the Defendants other than ICE are identical in substance to the request filed with ICE. On August 6, 2015, Plaintiffs re-filed the same request with any agency that might have already initiated a search for records to ensure that agency searches would encompass recently created or obtained records. Plaintiffs asked the agencies to treat these requests as continuations of the March requests.

statutory obligations, Defendants have been largely unresponsive or obstructive. Upon

information and belief, no Defendant has conducted a reasonable search for responsive records

as required by the FOIA.

70.    As of the date of filing of this Complaint, Defendants DHS, EOIR (by referral to

ICE) and FBI have produced a total of five records, totaling only 35 pages, plus one hyperlink to

an eight-page report and a link listing certain old DHS reports containing data relating to S-

Comm. The remaining seven Defendants have produced no responsive records at all. Defendants

have responded either by conducting inadequate searches not reasonably calculated to yield

relevant records, by refusing to even look for the requested records, or with only delay or silence.

71.    In response to litigation challenging their non-disclosure of information

concerning S-Comm, many of the same Defendants produced thousands of relevant and

previously undisclosed documents. These documents included policies, procedures, and

objectives; data and statistical information; agency communications; individual records; fiscal

impact; assessment records; and complaint mechanisms and oversight. This strongly suggests

that Defendants currently possess similar types of documents relevant to Plaintiffs' present FOIA

Request about S-Comm's termination and replacement with PEP.

72.    Defendants have uniformly denied Plaintiffs' requests for expedited processing

and failed to respond within the statutory time limit under FOIA.

73.    All Defendants have denied or failed to timely adjudicate Plaintiffs' requests for

fee waivers, with the exception of ICE, which granted Plaintiffs' fee waiver after Plaintiffs

administratively appealed ICE's initial denial, and USCIS.

74.    Defendants' failure to adequately respond to the March 2015 FOIA Requests or,

in some cases, subsequent administrative appeals, in a timely manner under 5 U.S.C. §

552(a)(6)(ii) results in constructive exhaustion of Plaintiffs' administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C). Requests for expedited processing do not need to be administratively exhausted. 5 U.S.C. § 552(a)(6)(iii); *Elec. Privacy Info. Ctr. v. Dep't of Defense*, 355 F. Supp. 2d 98, 100 n.1 (D.D.C. 2004). Plaintiffs have, however, exhausted administrative remedies for the denials of fee waiver and expedited requests by filing timely administrative appeals where appropriate. 5 U.S.C. § 552 (a)(6)(E)(iii); 5 U.S.C. § 552(a)(4)(A)(viii).

75.     Plaintiffs have a statutory right to the records they seek and there is no legal basis for Defendants' failure to disclose them. Defendants' withholding of records is unlawful in refusing to release documents and in causing unreasonable delay.

**A.  Department of Homeland Security**

76.     DHS received Plaintiffs' Request on March 9, 2015. DHS provided an interim response on May 19, 2015, acknowledging the FOIA Request and affirming it had received responsive documents from the DHS Office of the Inspector General ("OIG") on May 12, 2015. DHS received Plaintiffs' refiled Request on August 7, 2015. DHS provided a final response on August 19, 2015 including only hyperlinks to the publicly available "Annual Report, Immigration Enforcement Actions: 2013," dated September 2014; and to a general search of its "OIS annual report" with hyperlinks to previous annual reports.

77.     On September 25, 2015, Plaintiffs sent a letter appealing DHS's failure to conduct an adequate search and grant expedited processing. DHS acknowledged the appeal on September 30, 2015, but, as of the time of filing of this Complaint, had not provided a substantive response. DHS has not responded to Plaintiffs' request for expedited processing and fee waivers.

**B.  Immigration and Customs Enforcement**

78.     On March 16, 2015, ICE acknowledged receipt of the FOIA Request. ICE denied Plaintiffs' requests for expedited processing and a fee waiver, but stated that the agency would "respond to [Plaintiffs'] request as expeditiously as possible." Also on March 16, 2015, ICE sent Plaintiffs a separate letter stating that the FOIA Request was overbroad and unclear.

79.     On April 13, 2015, Plaintiffs contested ICE's assertions and requested clarification regarding ICE's stated concerns. ICE never responded. However, on May 8, 2015, Plaintiffs observed through a review of ICE's online database that ICE administratively closed the FOIA Request on April 16, 2015.

80.     On May 14, 2015, Plaintiffs appealed ICE's denial of the fee waiver request, and to the extent that ICE had indeed closed the case administratively, the denial of the FOIA Request without an adequate search. On June 16, 2015, the ICE Office of the Principal Legal Advisor ("OPLA") granted Plaintiffs' fee waiver request and remanded the FOIA Request to ICE "for further consideration."

81.     On July 14, 2015, in response to the remand from OPLA, ICE reiterated that it believed that the FOIA Request was overbroad and that Plaintiffs needed to provide a "reasonable description" of the records requested, threatening to administratively close the case if Plaintiffs did not respond within ten days. On July 23, 2015, "in the interest of receiving responsive records in an expeditious manner and of cooperating with the agency," Plaintiffs sent a second letter of clarification asking ICE to detail and explain what portions of the FOIA Request it saw as overbroad and "repeat[ed] [their] invitation to the agency to engage in dialogue on searches for, and production of, these records."

82.     In August and September 2015, Plaintiffs received communications from ICE committing to begin a search for responsive documents. On August 5, 2015, ICE's Deputy Director for FOIA, Fernando Pineiro, called Plaintiffs and committed to negotiate search terms in good faith and to task program officers to start searching for responsive records no later than August 7, 2015. On September 22, 2015, ICE FOIA Paralegal Specialist Marc Bittner e-mailed Plaintiffs, stating that "[ICE's] office is currently evaluating [the FOIA] request and hope[s] to provide a comprehensive update soon." The Plaintiffs have not received further substantive correspondence from Mr. Pineiro or Mr. Bittner despite multiple attempts to reach them.

83.     Instead, on October 5, 2015, Plaintiffs received a final response from ICE denying the FOIA Request in full on the ground that it "fail[ed] to reasonably describe the requested records as it [was] overly broad and unduly burdensome." This was the first letter from ICE that attempted to delineate the reasons why ICE believed the FOIA Request was too broad. Plaintiffs responded to these concerns in an administrative appeal on October 26, 2015, rebutting each of ICE's reasons for deeming the Request to be overbroad and demonstrating that ICE lacked a lawful reason to refuse to search for the responsive records. On November 27, 2015, ICE denied this administrative appeal. ICE's written communications conceded that the agency possesses records relevant to Plaintiffs' FOIA Request, but ICE nonetheless declined to search for or produce these records.

84.     ICE is the agency principally responsible for implementing PEP, yet it has consistently refused to produce a single document responsive to Plaintiffs' FOIA Request. Moreover, ICE's deceptive communications led Plaintiffs to believe ICE was willing to cooperate, which subjected Plaintiffs to burdensome delays waiting for promised searches that were never commenced.

### C.  U.S. Citizenship and Immigration Services

85.     USCIS confirmed delivery of the FOIA Request, claiming the agency received the Request on March 19, 2015. On March 20, 2015, USCIS granted Plaintiffs' fee waiver request, denied Plaintiffs' expedited processing request, and indicated that the agency possessed responsive records.

86.     On May 8, 2015, Plaintiffs sought clarification from USCIS concerning the responsive records and the agency's search cut-off date. On May 12, 2015, Brian McClay of USCIS called Plaintiffs and stated that USCIS was currently searching for records responsive to the entire request, and would search in locations including USCIS field offices, service centers, and the statistical center. He estimated that USCIS would produce responsive records within four months. In a letter on August 19, 2015, USCIS asserted that "most of the information requested falls under the purview of the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE)." USCIS received Plaintiffs' August, 2015 refiled Request on August 14, 2015. USCIS has issued no substantive response to date.

### D.  Customs and Border Protection

87.     CBP has yet to communicate with Plaintiffs in any way about their Request. Plaintiffs have verification that CBP received both the March, 2015 Request and the re-filed August, 2015 Request on March 9, 2015 and August 8, 2015, respectively.

### E.  DHS Office of Civil Rights and Civil Liberties

88.     DHS referred Plaintiffs' FOIA Request to CRCL. The DOJ Civil Rights Division, to which Plaintiffs sent their FOIA Request but which is not a Defendant in this Complaint, also informed Plaintiffs on July 13, 2015, that it had identified four records relating to PEP that were generated by CRCL and that it was referring these records to CRCL for production to Plaintiffs.

On July 28, 2015, CRCL asked Plaintiffs to narrow the scope of their FOIA Request, with respect only to CRCL, to a subset of three categories. On August 5, 2015, Plaintiffs agreed to narrow the search terms for CRCL but proposed a more expansive search than that proposed by CRCL. Since then, CRCL has not corresponded with Plaintiffs. CRCL received Plaintiffs' August, 2015 refiled Request on August 7, 2015.

### F.  Department of Justice

89.  DOJ acknowledged receipt of the FOIA Request on March 9, 2015, and of the re-filed request on August 21, 2015. Plaintiffs have received no further communication from DOJ.

### G.  DOJ Office of Legal Counsel

90.  On March 16, 2015, OLC acknowledged the FOIA Request, denied Plaintiffs' request for expedited processing, and stated that the agency would be unable to comply with the statutory deadline and would process the Request "as soon as possible."

91.  On April 13, 2015, Plaintiffs appealed OLC's denial of expedited processing and the agency's decision to "toll" the FOIA Request in violation of 5 U.S.C. § 552(a)(6)(A)(i). On April 24, 2015, OLC acknowledged receipt of Plaintiffs' appeal. To date, Plaintiffs have received no substantive response to the appeal. OLC received Plaintiffs' August, 2015 refiled Request on August 7, 2015.

### H.  Federal Bureau of Investigation

92.  On March 6, 2015, the FBI acknowledged receipt of the FOIA Request. The FBI provided an interim response on March 26, 2015, stating it was searching the Central Records System for responsive records, and denying Plaintiffs' request for expedited processing. On September 11, 2015, in response to the re-filed FOIA Request on August 6, the FBI issued the same interim response.

93.     On August 28, 2015, the FBI issued a final response producing two publicly-available records—one web article and one document with various newspaper excerpts. On September 25, 2015, Plaintiffs appealed the FBI's final response, challenging the adequacy of the search. On November 17, 2015, the DOJ OIP, which handles administrative appeals regarding FOIA responses by DOJ components, denied Plaintiffs' administrative appeal and upheld the FBI's search, claiming that the FBI's search for and disclosure of these limited documents was adequate and that its withholding of certain redacted information pursuant to FOIA exemptions was proper.

94.     On December 1, 2015, the FBI issued a final response to Plaintiffs' August re-filing of their FOIA Request, stating that the agency had searched for relevant records and had found none. On December 14, 2015, Plaintiffs administratively appealed this response, challenging the adequacy of the FBI's search. On January 6, 2016, the FBI denied Plaintiffs' administrative appeal, claiming that it conducted an adequate, reasonable search but could not locate any responsive records subject to the FOIA Request.

**I.   Executive Office of Immigration Review**

95.     In response to the FOIA Request, Cecilia Espinoza, EOIR Senior Associate General Counsel, called Plaintiffs on March 12, 2015 and in a voicemail claimed the Request is "misdirected" as DHS is the only agency with responsive records. By voicemail for Ms. Espinoza on March 30, 2015, Plaintiffs requested clarification.

96.     In a letter dated March 20, 2015, and received April 6, 2015, EOIR denied Plaintiffs' FOIA Request. On April 29, 2015, Plaintiffs sent a clarification letter and, having received no response, appealed the denial on May 14, 2015.

97.    On June 23, 2015, without explanation and possibly inadvertently, EOIR sent a second acknowledgement letter of the FOIA Request.

98.    EOIR received Plaintiffs' refiled Request on August 7, 2015.

99.    The DOJ OIP, which handles administrative appeals regarding FOIA responses by DOJ components, granted Plaintiffs' administrative appeal on September 8, 2015 and remanded the FOIA Request to the agency for searches to be conducted.

100.    EOIR responded on October 14, 2015, that it located 51 pages of responsive records that it sent to DHS for processing and production. EOIR affirmed that it would continue to search for documents. On November 12, 2015, Plaintiffs received 25 pages of records from ICE that appear to have been referred to ICE for processing by EOIR. Plaintiffs do not know when or if the other 26 pages that EOIR identified will be produced, or if not, on what grounds they are being withheld. EOIR has provided no date by which it will complete its searches.

**J.  DOJ Office of Information Policy**

101.    On March 19, 2015, OIP acknowledged Plaintiffs' Request and denied Plaintiffs' request for expedited processing. OIP did not respond to Plaintiffs' request for a fee waiver.

102.    On August 27, 2015, in a final response on behalf of the Offices of the Attorney General, Deputy Attorney General, Associate Attorney General, and Legislative Affairs, OIP asserted that it had conducted a search of the electronic database of the Departmental Executive Secretariat and located no responsive records. OIP subsequently emailed Plaintiffs again on the same day, stating that it wished to recall the initial email. However, later still on the same day, Plaintiffs received a third email with identical final responses to Plaintiffs' March 5, 2015 FOIA Request and August 6, 2015 re-filed FOIA Request attached.

103.    On September 25, 2015, Plaintiffs appealed OIP's final response on the ground that OIP did not conduct an adequate search and improperly denied Plaintiffs' request for expedited processing. OIP denied this appeal on December 18, 2015, stating it that it had conducted a reasonable, adequate search for records and found none.

## FIRST CLAIM FOR RELIEF

**Violation of FOIA for Failure to Disclose and Release Records Responsive to Requests**

104.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 103 as if repeated and incorporated herein.

105.    By failing to disclose and release the requested records, Defendants have violated the public's right, advanced by the Plaintiffs, to agency records under 5 U.S.C. § 552.

## SECOND CLAIM FOR RELIEF

**Improper Denial of Requests for Expedited Processing**

106.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 103 as if repeated and incorporated herein.

107.    Defendants have violated Plaintiffs' rights to expedited processing under 5 U.S.C. § 552(a)(6)(E) and Defendants' own regulations, 6 C.F.R. § 5.5(d) (DHS); and 28 C.F.R. § 16.5 (DOJ).

## THIRD CLAIM FOR RELIEF

**Improper Denial of Requests for a Fee Waiver**

108.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 103 as if repeated and incorporated herein.

109.    Defendants have violated Plaintiffs' rights to a fee waiver under 5 U.S.C. §

552(a)(4)(A)(iii) and Defendants' own regulations 6 C.F.R. § 5.11(k) (DHS) and 28 C.F.R. §

16.11(k) (DOJ).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1)    Order Defendants immediately to make a full, adequate, and expedited search for

the requested records;

2)    Order Defendants to engage in expedited processing in this action;

3)    Enjoin Defendants from assessing fees or costs for the processing of the FOIA

Request;

4)    Order Defendants, upon completion of expedited processing, to disclose the

requested records in their entirety and make copies available to Plaintiffs as soon as practicable

after the Court's order, with a rolling production every month after the Court's order and

completion no later than 90 days thereafter;

5)    Order Defendants to disclose the requested records consistent with the format

described and requested in the FOIA Request (B. Protocol Governing the Production of Records,

pp. 5-6);

6)    Award Plaintiffs their costs and reasonable attorney's fees incurred in this action

as provided by 5 U.S.C. § 552(a)(4)(E); and,

7)    Grant such other and further relief as this Court may deem just and proper.

Respectfully submitted,


Date:   January 19, 2016          /s/ Peter Markowitz
                                  Peter Markowitz, Esq., Bar No. PM-9052
New York, New York                Thomas Fritzsche, Esq., *Pro hac vice application forthcoming*

Danelly Bello, Law Student Intern
Sophia Gurulé, Law Student Intern
Jacob Onile-Ere, Law Student Intern
IMMIGRATION JUSTICE CLINIC
Benjamin N. Cardozo School of Law
55 Fifth Avenue, Room 1156
New York, NY 10003
(212) 790-0895
peter.markowitz@yu.edu
thomas.fritzsche@yu.edu

Emilou MacLean, Esq., Bar No. EM0121
NATIONAL DAY LABORER ORGANIZING NETWORK
675 S. Park View Street, Suite B
Los Angeles, CA 90057
emi@ndlon.org

Angela Chan, Esq., *Pro hac vice application forthcoming*
Saira Hussain, Esq., *Pro hac vice application forthcoming*
ASIAN AMERICANS ADVANCING JUSTICE – ASIAN LAW
CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
(415) 848-7707
angelac@advancincjustice-alc.org
sairah@advancingjustice-alc.org

Attorneys for Plaintiffs

Anthony Diana (AD-9914)
Therese Craparo (TC-4003)
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022

Counsel for Plaintiff National Day Laborer Organizing Network