UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                          :

NATIONAL DAY LABORER ORGANIZING    :
NETWORK, ASIAN AMERICANS ADVANCING   :          16 Civ. 387 (PAE)
JUSTICE – ASIAN LAW CAUCUS and the     :
IMMIGRATION CLINIC OF THE BENJAMIN N.   :        OPINION & ORDER
CARDOZO SCHOOL OF LAW,              :
                                            :
                        Plaintiffs,        :
                                            :
                  -v-                :
                                            :
UNITED STATES IMMIGRATION AND CUSTOMS    :
ENFORCEMENT, U.S. CUSTOMS AND BORDER     :
PROTECTION, UNITED STATES DEPARTMENT OF   :
HOMELAND SECURITY, and the DEPARTMENT OF   :
HOMELAND SECURITY'S OFFICE OF CIVIL RIGHTS :
AND CIVIL LIBERTIES,                :
                                            :
                      Defendants.      :
                                            :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       This lawsuit, brought under the Freedom of Information Act, 5 U.S.C. § 552 *et seq.*

("FOIA"), arises out of a request by plaintiffs National Day Laborer Organizing Network

("NDLON"), Asian Americans Advancing Justice – Asian Law Caucus ("AAAJ–ALC") and the

Immigration Clinic of the Benjamin N. Cardozo School of Law (together "Plaintiffs") for records

about a since-discontinued federal program governing immigration enforcement: the Priority

Enforcement Program ("PEP"). The remaining defendants are U.S. Immigration and Customs

Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), the U.S. Department of

Homeland Security ("DHS"), and its Office of Civil Rights and Civil Liberties ("CRCL," and

together with ICE, CBP, and DHS, "Defendants").[1]  Pending now are the parties' cross-motions

for summary judgment as to whether Defendants properly withheld 218 records, almost all

pursuant to the deliberative process privilege under FOIA Exemption 5, 5 U.S.C. § 552(b)(5)

("Exemption 5").  For the reasons that follow, the Court grants in part and denies in part the

cross-motions, and directs that a subset of the records be furnished to the Court for its *in camera*

review.

## I.      Background[2]

The Court assumes familiarity with the underlying facts of this litigation, which, unless

specified, are not disputed.  The Court here provides background only as relevant to the issues

raised by the instant cross-motions.

### A.      The Priority Enforcement Program

On November 20, 2014, then-Secretary of Homeland Security Jeh Johnson established,

by memorandum, PEP.  *See* PEP Mem.  PEP was the immediate successor to the DHS's "Secure

---

[1] Defendants U.S. Citizenship and Immigration Services, Executive Office for Immigration Review, Federal Bureau of Investigation, U.S. Department of Justice ("DOJ"), DOJ's Office of Information Policy, and DOJ's Office of Legal Counsel were previously dismissed.

[2] Plaintiffs' declaration reattaches a series of declarations from the prior summary judgment motions filed in this case, some of which recap factual background to their FOIA requests. Defendants' affidavits do not address this background.  Because the background facts do not appear in dispute, and in any event are only tangentially related to the legal questions presently before the court, the Court includes in the following account facts drawn from the Complaint, Dkt. 1 ("Compl."), and the parties' briefs.

Relatedly, the Declaration of Erika Kweon, Esq., Dkt. 174 ("Kweon Decl."), in support of Plaintiff's cross-motion, attaches several publicly available Government documents including, *inter alia*, the November 20, 2014 memorandum of Secretary Johnson entitled "Secure Communities," *id.*, Ex. 5 ("Secure Comm. Mem."), and the November 20, 2014 memorandum of Secretary Johnson entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," *id.*, Ex. 6 ("PEP Mem.").  The Court takes judicial notice of these documents but does not rely on their contents for the truth of the matter asserted.  *See, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

Communities" program, which had sought "to more effectively identify and facilitate the removal of" undocumented immigrants convicted of crimes who were "in the custody of state and local law enforcement agencies." *See* Secure Comm. Mem. at 1.  DHS did so by entering into agreements with state and local law enforcement agencies ("LEA"s) in which LEAs agreed to share fingerprints with DHS and inform DHS when non-citizens were to be imminently released from LEA custody.  *See generally* Secure Comm. Mem.  In some cases, LEAs agreed to hold non-citizens for up to 48 hours beyond when they would otherwise be released pursuant to a DHS "detainer," to allow DHS to take the non-citizen directly into immigration custody.  *Id.* at 2.

Explaining the rescission of the Secure Communities program, Secretary Johnson stated that "its very name has become a symbol for general hostility toward the enforcement of our immigration laws," with "[g]overnors, mayors, and LEA officials . . . increasingly refus[ing] to cooperate with the program" and a number of state and local officials having "issued executive orders or signed laws prohibiting such cooperation." *Id.* at 1.  Moreover, Secretary Johnson explained, "[a] number of federal courts have rejected the authority of state and local law enforcement agencies to detain immigrants pursuant to federal detainers issued under the current Secure Communities program." *Id.*

However, because "[t]he overarching goal of Secure Communities remain[ed] . . . a valid and important law enforcement objective," Secretary Johnson announced "a fresh start and a new program"—PEP.  *Id.* at 1, 3.  Under PEP, DHS would "continue to rely on fingerprint-based biometric data submitted during bookings by [LEAs] to the Federal Bureau of Investigation for criminal background checks," but DHS would "seek the transfer of a [non-citizen]" to immigration custody only "when the [non-citizen] has been convicted of a[] [Priority] offense"

as described in the PEP Memo, which was issued the same day.  *Id.* at 2; *see also* PEP Mem. PEP also introduced changes to the use of DHS detainers.  *See* Secure Comm. Mem. at 2.

Plaintiffs are civil rights and immigrant rights organizations that were heavily involved in efforts to pressure state and local governments to cease participating in Secure Communities and in challenging the constitutionality of that program in federal court.  *See* Kweon Decl., Ex. 4 ("Newman Decl.") ¶¶ 7–16.  Plaintiffs credit their success in such advocacy in large part to the information obtained from DHS through intensely litigated FOIA requests.  *Id.*  Concerned that PEP was a change in name only, Dkt. 175 ("Pl. Mem.") at 5–6, Plaintiffs in March 2015 began submitting FOIA requests to Defendants for detailed information about PEP.  Plaintiffs sought, *inter alia*, "records related to policies, procedures, and objectives" of PEP; "data and statistical information" about the program; "agency communications concerning PEP"; information about "PEP's fiscal impact"; internal "assessments of PEP"; and records related to "complaint mechanisms and oversight of PEP."  Compl. ¶ 66.

## B.    History of this Litigation

On March 5, 2015, Plaintiffs submitted their FOIA requests to Defendants.  *Id.*  On January 19, 2016, Plaintiffs commenced this lawsuit, *see* Compl., after receiving a "total[] of 35 pages" and two hyperlinks from DHS, EOIR, and the FBI, and no records from the remaining seven defendants, *id.* ¶ 70.  "On April 14, 2016, Plaintiff[s] submitted a narrowed FOIA request . . . which Defendants accepted as the operative request on May 4, 2016."  Pl. Mem. at 6; *see also* Dkts. 64, 72.  After four years of litigation, including two partial summary judgment rulings by the Hon. Katherine B. Forrest, to whom this case was previously assigned,[3] Defendants have

---

[3] On February 17, 2017, Judge Forrest granted, in part, Plaintiff's partial motion for summary judgment and set a production deadline of October 31, 2017 for records from DHS and CRCL, and a production deadline of July 2, 2018, for records from ICE.  *See* Dkt. 131.  On April 19, 2017,

now produced thousands of responsive records, including "more than ten thousand pages of records from ICE alone." Dkt. 179 ("Def. Opp'n") at 1, 28 n.11.

The parties' remaining dispute concerns 206 records that Defendants seek to withhold pursuant to FOIA Exemption 5, largely under the deliberative process privilege.[4] Defendants usefully group the withheld records into four categories. First, Defendants claim that most of these records are exempt as draft documents or emails relating to such drafts. Dkt. 178 ("Def. Mem.") at 5. Second, Defendants claim that some records are exempt "talking points." *Id.* Third, Defendants claim that eight documents are exempt as deliberative memoranda for high-level officials discussing policy proposals that were not ultimately adopted. *Id.* at 6. Fourth, Defendants claim that some records are exempt under not only the deliberative process privilege, but also under the attorney-client privilege and the work product doctrine. *Id.*

C.     **Procedural History**

On January 31, 2020, Defendants filed their motion for summary judgment, Dkt. 164; an opening memorandum of law, Dkt. 165, later corrected with leave of the Court, *see* Def. Mem.; the Declaration of Patrick Howard, Dkt. 166 ("Howard Decl."), with an attached *Vaughn* Index, Dkt. 166-1 ("CBP *Vaughn* Index"); the Declaration of James V.M.L. Holzer, Dkt. 167 ("Holzer Decl."), with an attached *Vaughn* Index, Dkt. 167-1 ("DHS *Vaughn* Index"); and the Declaration of Fernando Pineiro, Dkt. 168 ("Pineiro Decl."), with an attached *Vaughn* Index, Dkt. 168-1

---

Judge Forrest granted summary judgment to the FBI and EOIR, granted partial summary judgment to USCIS, and narrowed the scope of ICE's response to Plaintiffs' FOIA request. *See* Dkt. 132.

[4] The summary chart attached to Defendants' opening brief lists 218 records at issue, Dkt. 178-1 ("Def. Chart"), but the parties have since agreed that the following 12 records are not in dispute: DHS Record Nos. 8, 42, 43, 79, 103, 105, 106, 107, 113, 114, 120; CBP Record No. 2. *See* Pl. Mem. at 7 n.5 (eight records no longer in dispute); Def. Opp'n. at 1 n.2 (two additional records not in dispute); Dkt. 183 ("Pl. Reply") at 1 n.1 (two additional records not in dispute).

("ICE *Vaughn* Index").   On April 16, 2020, Plaintiffs filed their cross-motion for summary judgment, Dkt. 173, an opening memorandum of law, Pl. Mem., and the declaration of Erika Kweon, Esq., Kweon Decl., with attached exhibits.   On June 1, 2020, Defendants filed a combined brief in opposition to Plaintiffs' cross-motion and in support of their motion for summary judgment, Def. Opp'n, and the Declaration of Samuel Dolinger, Esq., Dkt. 180 ("Dolinger Decl."), with attached exhibits.   On July 1, 2020, Plaintiffs filed a combined brief in opposition to Defendants' motion for summary judgment and in support of their cross-motion. Pl. Reply.

## II.   Applicable Legal Standards

### A.   Summary Judgment Motions in General

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The movant bears the burden of demonstrating the absence of a question of material fact.   In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.   *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).   "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).   Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).   In

determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### B.   Agency Obligations under FOIA

FOIA governs public access to information held by the federal government. "The basic purpose of FOIA is to ensure an informed citizenry, [which is] vital to the functioning of a democratic society, [and] needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). However, "Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information, and therefore provided the specific exemptions under which disclosure could be refused." *Id.* (internal quotation marks omitted). "Recognizing past abuses, Congress sought to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *Id.* (internal quotation marks omitted).

"FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Id.* (internal citations and quotation marks omitted). "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009). Courts review the adequacy of the agency's justifications *de novo*. *Id.*

Even where portions of a responsive record are properly withheld, "[a]ny reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt[.]"  5 U.S.C. § 552(b).  "This provision requires agencies and courts to differentiate among the contents of a document rather than to treat it as an indivisible 'record' for FOIA purposes."  *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 210 F. Supp. 3d 467, 485 (S.D.N.Y. 2016) (quoting *FBI v. Abramson*, 456 U.S. 615, 626 (1982)).  "An agency may only withhold a document's non-exempt portions if they are 'inextricably intertwined' with the exempt portions."  *Knight First Amendment Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, 407 F. Supp. 3d 334, 343 (S.D.N.Y. 2019) (quoting *Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Reserve Sys.*, 463 F.3d 239, 249 n.10 (2d Cir. 2006)).  Consistent with this principle, "the deliberative process privilege does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must."  *Loving v. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008).

"The agency bears the burden of demonstrating that no reasonably segregable material exists in the withheld documents.  The agency must provide a detailed justification for its non-segregability but need not provide so much detail that the exempt material would be effectively disclosed."  *Watkins Law & Advocacy, PLLC v. U.S. Dep't of Veterans Affairs*, 412 F. Supp. 3d 98, 114 (D.D.C. 2019) (internal quotation marks and citations omitted).  Agency affidavits to this effect are accorded a presumption of good faith.  *See Am. Civil Liberties Union v. U.S. Dep't of Justice*, 252 F. Supp. 3d 217, 223 (S.D.N.Y. 2017); *Gonzalez v. U.S. Citizenship & Immigr. Servs.*, No. 19 Civ. 2911 (JGK), 2020 WL 4343872, at *13 (S.D.N.Y. July 29, 2020).

### C.    Summary Judgment Standards for FOIA Disputes

Summary judgment is the usual means by which a court resolves a challenge to a government agency's FOIA response.  *See, e.g.*, *Johnson v. CIA*, No. 17 Civ. 1928 (CM),

2018 WL 833940, at *2 (S.D.N.Y. Jan. 30, 2018); *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner*, 592 F.3d at 73 (citation omitted). An agency's affidavits in support of its nondisclosure are "accorded a presumption of good faith." *Carney*, 19 F.3d at 812 (internal quotation marks and citation omitted). However, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the [G]overnment's burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wilner*, 592 F.3d at 73 (citation omitted).

### D.   FOIA Exemption 5

FOIA Exemption 5 prevents the disclosure of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency," so long as the materials are less than 25 years old. 5 U.S.C. § 552(b)(5). "Courts have interpreted Exemption 5 to encompass traditional common-law [civil litigation] privileges against disclosure, including the work-product doctrine, and executive, deliberative process and attorney-client privileges." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005); *Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency* ("*NRDC II*"), No. 17 Civ. 5928 (JMF), 2019 WL 4142725, at *3 (S.D.N.Y. Aug. 30, 2019); *see also Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).

Centrally important here, Defendants have widely invoked Exemption 5 on the basis of the deliberative process privilege. That privilege "is based 'on the policy of protecting the

decision making processes of government agencies'" and typically "'focuses on documents reflecting advisory opinions, recommendations and deliberations comprising part of [the] process by which governmental decisions and policies are formulated.'" *Brennan Ctr. for Justice at N.Y. Univ. Sch. of L. v. U.S. Dep't of Justice*, 697 F.3d 184, 194 (2d Cir. 2012) (quoting *NLRB v. Sears, Roebuck, & Co.*, 421 U.S. 132, 150 (1975)); *see also Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) ("The privilege protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." (internal quotation marks omitted)).  By affording protection to such communications, the privilege seeks to encourage candor between policymakers and thereby improve the quality of the policymaking itself.  *See, e.g.*, *Sears*, 421 U.S. at 150–51; *Nat'l Council of La Raza*, 411 F.3d at 356 ("The deliberative process privilege is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials.").  The deliberative process privilege therefore "calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be."  *Sears*, 421 U.S. at 153 (internal quotation marks omitted).

"An inter- or intra-agency document may be withheld pursuant to the deliberative process privilege if it is: (1) pre[-]decisional, *i.e.*, prepared in order to assist an agency decision[]maker in arriving at his decision, and (2) deliberative, *i.e.*, actually related to the process by which policies are formulated."  *Brennan Ctr.*, 697 F.3d at 194 (alterations, ellipses, and internal quotation marks omitted); *see also Grand Cent. P'ship*, 166 F.3d at 482.  "In assessing whether a document is pre[-]decisional, courts also consider whether the government

10

can: (i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the decision to which it relates." *Adelante Ala. Worker Ctr. v. U.S. Dep't of Homeland Sec.*, 376 F. Supp. 3d 345, 357 (S.D.N.Y. 2019) (internal quotation marks omitted); *see also Seife v. U.S. Dep't of State*, 298 F. Supp. 3d 592, 614 (S.D.N.Y. 2018); *Nat'l Cong. for Puerto Rican Rights ex rel. Perez v. City of New York*, 194 F.R.D. 88, 92 (S.D.N.Y. 2000).

> For an agency to establish that a document is deliberative,
>
> the agency need not show *ex post* that a decision was made based on the document, [but] it must be able to demonstrate that, *ex ante*, the document for which [the] privilege is claimed related to a specific decision facing the agency. Considerations informing whether a record is "deliberative" include whether the document (i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency.

*NRDC II*, 2019 WL 4142725, at *6 (internal quotation marks, citations, and alterations omitted). The privilege "generally does not cover purely factual material.  Nor does it cover records that are merely peripheral to actual policy formation; the records must bear *on the formulation or exercise of policy-oriented judgment*." *Id.* (emphasis added) (internal quotation marks and citation omitted); *see also Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 80 (2d Cir. 2002).  Finally, "materials related to the explanation, interpretation or application of an existing policy, as opposed to the formulation of a new policy," are not subject to the privilege.  *Davis v. City of New York* ("*Davis I*"), No. 10 Civ. 699 (SAS), 2011 WL 1742748, at *2 (S.D.N.Y. May 5, 2011) (quoting *Resolution Tr. Corp. v. Diamond*, 137 F.R.D. 634, 641 (S.D.N.Y. 1991)); *see also Noel v. City of New York*, No. 15 Civ. 5236 (LTS) (KHP), 2019 WL 3852444, at *2 (S.D.N.Y. Aug. 15, 2019); *Cordero v. City of New York*, No. 15 Civ. 3436 (JBW) (CLP), 2017 WL 6375739,

at *4 (E.D.N.Y. Dec. 13, 2017); *Greene v. City of New York*, No. 08 Civ. 243 (RJD),

2012 WL 5932676, at *4 (E.D.N.Y. Nov. 27, 2012); *Dipace v. Goord*, 218 F.R.D. 399, 403

(S.D.N.Y. 2003).

### E. The FOIA Improvement Act

Congress passed the FOIA Improvement Act of 2016 both to address a "growing backlog" of FOIA requests and out of concern that "agencies [we]re overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure." Senate Report 114-4 discussed in particular the "growing and troubling trend towards relying on these discretionary exemptions"—especially Exemption 5—"to withhold large swaths of Government information, even though no harm would result from disclosure." The Act therefore provided for a "presumption of openness" for FOIA requests and "mandate[d] that an agency may withhold information only if it reasonably foresees a specific identifiable harm to an interest protected by an exemption, or if disclosure is prohibited by law." In particular, it was contemplated that information should "not be withheld merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears."

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, No. 19 Civ. 3265 (CKK), 2020 WL 5095520, at *8

(D.D.C. Aug. 28, 2020) (quoting S. Rep. No. 114-4 (2016), *as reprinted in* 2016 U.S.C.C.A.N.

321, 322–24).

As a result of the 2016 Act, the FOIA statute now provides that "[a]n agency shall

withhold information . . . only if the agency reasonably foresees that disclosure would harm an

interest protected by an exemption described" in one of the enumerated exemptions or

"disclosure is prohibited by law." 5 U.S.C. § 552 (a)(8)(A)(i). "Stated differently, pursuant to

the FOIA Improvement Act, an agency must release a record—*even if it falls within a FOIA*

*exemption*—if releasing the record would not reasonably harm an exemption-protected interest

and if its disclosure is not prohibited by law." *Rosenberg v. U.S. Dep't of Def.*,

342 F. Supp. 3d 62, 73 (D.D.C. 2018) (emphasis added). "[T]his provision imposes an

independent and meaningful requirement on agencies before they may withhold a record under

one of FOIA's exemptions." *NRDC II*, 2019 WL 4142725, at *3.

"Accordingly, 'to satisfy the foreseeable harm standard,' an agency 'must explain how a particular Exemption 5 withholding would harm the agency's deliberative process.'  An agency may not 'perfunctorily state that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information' among or between government officials."  *Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency* ("*NRDC I*"), No. 17 Civ. 5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019) (internal citations omitted) (quoting *Rosenberg*, 342 F. Supp. 3d at 78) (citing *Judicial Watch, Inc. v. U.S. Dep't of Com.*, 375 F. Supp. 3d 93, 99–100 (D.D.C. 2019)); *see also Judicial Watch*, 375 F. Supp. 3d at 100 ("boiler plate" and generalized articulations of harm insufficient).  "If the mere possibility that disclosure discourages a frank and open dialogue was enough for the exemption to apply, then Exemption 5 would apply whenever the deliberative process privilege was invoked regardless of whether disclosure of the information would harm an interest protected by the exemption."  *Judicial Watch*, 375 F. Supp. 3d at 101; *see also NRDC I*, 2019 WL 3338266, at *1 (directing agency to "submit a supplemental or revised affidavit and/or *Vaughn* index that more specifically and particularly describes the Exemption 5-related interests that would be harmed by disclosure of the documents at issue").

## III. Discussion

The Court begins by resolving ICE's claim that attorney-client privilege and the work product doctrine—alongside the deliberative product privilege—protect 13 records at issue.  The Court then addresses Defendants' application of the deliberative process privilege to, in sequence, the (1) deliberative memoranda, (2) talking points, (3) emails, and (4) draft documents.

A.       **Attorney-Client Privilege and Work Product Doctrine**

ICE claims that 13 records are protected under Exemption 5 because they are—in addition to being drafts—protected by attorney-client privilege and/or the work product doctrine.[5]  For the reasons that follow, the Court is unpersuaded.

a.       *Attorney-Client Privilege*

"The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance." *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007), and applies to qualifying communications between government lawyers and agency staff, *In re Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005).  "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Cnty. of Erie*, 473 F.3d at 419.  Courts "construe the privilege narrowly because it renders relevant information undiscoverable[] [and] apply it only where necessary to achieve its purpose.  The burden of establishing the applicability of the privilege rests with the party invoking it." *Id.* at 418.  And, while sometimes relevant, the label affixed to a document is not itself dispositive as to whether the privilege applies.  *See Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings, Inc.*, No. 11 Civ. 6189 (DLC), 2014 WL 1327952, at *3 (S.D.N.Y. Apr. 3, 2014) ("Although the document . . . bears a footer marking it as privileged, there is an insufficient basis to conclude that it is privileged."); *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 289 F.R.D. 41, 48 (E.D.N.Y. 2011) ("Focusing on the descriptive portion on the [privilege] log and ignoring the conclusory labels . . . [plaintiff] has not met its 'heavy burden' of

---

[5] This includes 11 records that ICE claims are protected by both the attorney-client privilege and the work product doctrine, ICE Record Nos. 2, 3, 6, 34, 39, 78, 79, 85, 86, 88, 89, one that it claims is protected only by the privilege, ICE Record No. 75, and one that it claims is protected only by the work product doctrine, ICE Record No. 43.

proving that the privilege or protection applies to the documents or communications at issue."
(citation omitted)); *cf. United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 5287994, at *3
(S.D.N.Y. Oct. 18, 2019) (rejecting "the proposition that materials can become [irrefutably
protected by attorney-client] privilege[] by the simple expedient of labeling them as such")

"Fundamentally, legal advice involves the interpretation and application of legal
principles to guide future conduct or to assess past conduct"—"[i]t requires a lawyer to rely on
legal education and experience to inform judgment." *Cnty. of Erie*, 473 F.3d at 419.  Courts
have recognized, however, that legal advice, whether in the context of business or government, is
sometimes "broader" and "not demarcated by a bright line." *Id.* at 420.  Thus, the critical
question is whether "the predominant purpose of the communication is to render or solicit legal
advice." *Id.*  "When an attorney is consulted in a capacity other than as a lawyer, as (for
example) a policy advisor, media expert, business consultant, banker, referee or friend, that
consultation is not privileged." *Id.* at 421.  In other words, there is a vital distinction between
"advice that can be rendered only by consulting the legal authorities and advice that can be given
by a non-lawyer." *Id.*

Applying these principles to the relevant records, the Court finds—with one exception—
that on the basis of the information provided by Defendants, none are protected by attorney-
client privilege:[6]

---

[6] In addition to the information described here, the *Vaughn* entry for each record includes, nearly
verbatim, the following:

> [T]he attorney-client privilege is also applicable to the portions of these records.
> Communications between ICE attorneys and their clients (ICE agents and officers
> and/or DHS employees) were made for the purpose of securing legal advice or
> service regarding PEP.   Attorney-client communications are shielded from
> disclosure in order to encourage a full and frank discussion between the client and

- **ICE Record No. 2**:  The *Vaughn* entry for this record describes it as "draft [Talking Points] notes for *any* ICE employee giving a presentation *to the field* on PEP."  *See* ICE *Vaughn* Index, Record No. 2 (emphasis added).  Defendants argue that because the talking points "specify that they are for" the Criminal Alien Division of the ICE Enforcement and Removal Operations ("ERO") "*or* the Office of the Principal Legal Advisor ["OPLA"]," "the intended audience is ERO personnel or OPLA attorneys in various field offices."  *Id.* (emphasis added).  This entry is insufficient to establish that this document is protected by attorney-client privilege.  There is no information as to the authors of this document, the distribution of the document appears widespread, and there is no basis to conclude that it contains legal advice.

- **ICE Record No. 3**: The *Vaughn* entry for this record states that it contains: "[Talking Point]s, background, current status reports, future requirements, enforcement priorities, and Q&As" relating to PEP.  *Id.*, Record No. 3.  The entry concedes that "the document does not contain information on the audience or preparer" but argues that "the focus on legal issues regarding PEP indicates a legal audience and/or presenter."  This entry is insufficient to establish that this document is protected by attorney-client privilege.  There is no basis for the Court to find satisfied any of the three elements of the privilege.

- **ICE Record No. 6**: The *Vaughn* entry for this record describes it as "a draft of a meeting agenda for a[n] April 15, 2015 meeting about Executive Immigration Reform actions.  The audience is unknown.  The document covers such topics as removal statistics by priority, steps to increase arrests, and enforcement priorities."  *Id.*, Record No. 6.  ICE claims the entire document as privileged, but the only stated involvement of legal counsel is "comment balloons from OPLA attorneys regarding legal considerations, revisions, and necessary leadership clearances."  Although edits by an attorney may constitute protected legal advice, "non-substantive edits and revisions to a draft document" are not.  *Davis v. City of New York* ("*Davis II*"), No. 10 Civ. 699 (SAS) (HBP), 2012 WL 612794, at *11 (S.D.N.Y. Feb. 27, 2012), *modified in part on reconsideration*,

---

his legal advisor.  The attorney-client privilege recognizes that sound legal advice or advocacy depends upon a lawyer being fully informed by his client.  If these communications, as covered by the attorney-client privilege, were disclosed, this could result in a chilling effect on interactions and communications between agency employees and their legal counsel.

*See e.g.*, ICE *Vaughn* Index, Record No. 2.  However able a description this may be of the purpose of the attorney-client privilege generally, it says nothing about why it applies to *the specific record at issue*.

2012 WL 2401973 (S.D.N.Y. June 26, 2012).  The Court finds that comment bubbles by OPLA attorneys regarding "legal considerations"—and only those comment bubbles—are protected by attorney-client privilege.  The balance of the document, however, is not.

- **ICE Record No. 39**: This record is titled "External DHS/ICE Frequently Asked Questions Relating to Executive Action on Immigration" and is described as "an FAQ about PEP." *Id.*, Record No. 39.  It provides "answers on such topics as the enforcement priorities, information for people who believe their detainer or priority demarcation is erroneous, prosecutorial discretion, and what the definitions in the priorities mean[.]" *Id.*  It was "sent by the Senior Advisor to the ICE Director to the ICE Directorates seeking input on the draft FAQs" and is watermarked, *inter alia*, "Attorney-Client Communication." *Id.*  This entry is insufficient to establish that this document is protected by attorney-client privilege.  There is no basis to find that the contents contained legal advice, or that the document was not distributed so widely within the agency as to defeat confidentiality.  The label affixed to the document is inadequate to overcome these deficiencies.

- **ICE Record No. 75**:  This document is titled "Internal DHS/ICE Frequently Asked Questions Relating to Executive Action on Immigration." *Id.*, Record No. 75.  Aside from being written "for interagency use," the *Vaughn* entry is nearly identical to ICE Record No. 39, *supra*.  For the same reasons as ICE Record No. 39, this entry is insufficient to establish that this document is protected by attorney-client privilege.

- **ICE Record No. 88**:  This record is titled "Guidance for the Use of the Form I-247X Request for Voluntary Transfer (Immigration Detainers)." *Id.*, Record No. 88.  The *Vaughn* entry describes it as "draft documents, written by field office OPLA attorneys, that instruct an unknown audience on when and how immigration detainer[ forms] are to be used for both priority aliens (i.e. I-247D and I-247N forms) and non-PEP priority aliens (i.e., I-247X form)." *Id.*  This description is insufficient to establish that the information contained in this record is privileged in nature.  This record is therefore not protected by attorney-client privilege.

- **ICE Record No. 89**: This record is entitled "ICE Internal Employee FAQs on Executive Action" and is described as "an FAQ about PEP for interagency use. It lays out answers to five questions about enforcement priorities, training on DHS priorities, and DACA or deferred action from USCIS." *Id.*, Record No. 89.  It is watermarked, *inter alia*, "Attorney-Client Communication."  This *Vaughn* entry provides no information as to the author(s) or recipient(s) of this document,

the breadth of its internal distribution, or, critically, as to its contents.  It therefore
fails to establish any of the elements of attorney-privilege.

- **ICE Record Nos. 34, 78, 79, 85, 86**: These five records are all drafts of DHS
forms used to effectuate parts of PEP.  The Court finds that there is nothing
inherent in the creation of such draft forms that makes them subject to attorney-
client privilege, because Defendants have not proffered any basis to find that the
ministerial act of creating the form required legal advice or the application of
legal training.  The Court addresses the individual records below to the extent
that they contain additional characteristics that may bring them within the
privilege:

    o **ICE Record No. 34**: This record is "draft versions of the I-247D &
    I-247N forms, sent from agency counsel to program offices for review
    and comment."  *Id.*, Record No. 34.  They are marked, *inter alia*,
    "Attorney-Client Communication."  *Id.*  On the basis of this description, it
    is not established that this draft is covered by attorney-client privilege.

    o **ICE Record No. 78**: This record consists of "two copies of a draft I-
    247D form" and is watermarked, *inter alia*, "Attorney-Client
    Communication."  *Id.*, Record No. 78.  And the "second copy [of the draft
    form] contains a comment bubble containing a remark from ICE OPLA."
    *Id.*  This description, without more, does not provide a basis to find that
    this record is protected by attorney-client privilege.

    o **ICE Record No. 79**: This record consists of "copies of a 3-page draft I-
    247N form" and is watermarked, *inter alia*, "Attorney-Client
    Communication."  *Id.*, Record No. 79.  And one copy "contains a
    comment bubble containing a remark from ICE OPLA."  *Id.*  This
    description, without more, does not provide a basis to find that this record
    is protected by attorney-client privilege.

    o **ICE Record No. 85**: This record is "a draft I-247D form" and is
    watermarked, *inter alia*, "Attorney-Client Communication."  *Id.*, Record
    No. 85.  This description, without more, does not provide a basis to find
    that this record is protected by attorney-client privilege.

    o **ICE Record No. 86**: This record is "a draft I-247D form" and is
    watermarked, *inter alia*, "Attorney-Client Communication."  *Id.*, Record
    No. 86.  This description, without more, does not provide a basis to find
    that this record is protected by attorney-client privilege.

The Court therefore finds that, with the exception of the "comment bubbles by OPLA

attorneys regarding 'legal considerations'" contained in ICE Record No. 6, none of the above

records are protected by attorney-client privilege.  The Court considers *infra* whether they are

otherwise exempt under FOIA.

### b.  *Work Product Doctrine*

ICE separately claims that 12 records are protected by the work product doctrine.  *See*

*supra*, note 5.  For the work product doctrine to apply, the material at issue "must be

(1) documents or tangible things, (2) that were prepared in anticipation of litigation, and (3) were

prepared by or for a party, or by or for his representative."  *Roc Nation LLC v. HCC Int'l Ins.*

*Co., PLC*, No. 19 Civ. 554 (PAE), 2020 WL 1970697, at *3 (S.D.N.Y. Apr. 24, 2020).

"Documents prepared in anticipation of litigation are those that, 'in light of the nature of the

document and the factual situation in the particular case can fairly be said to have been prepared

or obtained *because of* the prospect of litigation.'"  *Weber v. Paduano*, No. 02 Civ. 3392 (GEL),

2003 WL 161340, at *3 (S.D.N.Y. Jan. 22, 2003) (quoting *United States v. Adlman*, 134 F.3d 1194,

1202 (2d Cir. 1998) (emphasis in original)); *see also* Fed. R. Civ. P. 26(b)(3)(A).  "Thus,

documents that were prepared in the ordinary course of business or that would have been created

in essentially similar form irrespective of the litigation are not protected by the work product

doctrine."  *Weber*, 2003 WL 161340, at *3.

> Defendants argue that these records are protected by the work product doctrine because:
>
> PEP fundamentally involves ICE detainers and the immigration enforcement
> priorities for alien arrests.  Those issues have been the subject of extensive
> litigation in the past.  Thus, the ICE attorneys provided comments on the
> documents with potential legal challenges to PEP and its associated practices in
> the forefront of their minds.  Accordingly, the documents contain mental
> impressions of attorneys that were prepared in anticipation of litigation against
> ICE.  As such, the documents were properly withheld under the work product
> doctrine.

Def. Mem. at 25 (internal citations omitted).

That narrative does not justify invocation of the work product doctrine. As Plaintiffs rightly observe, "Defendants are arguing that because lawsuits have been brought in the past on detainers generally, and because PEP involves ICE detainers, then ICE attorneys commenting on PEP documents necessarily were doing so in anticipation of some potential, future litigation about detainers." Pl. Mem. at 20. But that logic is far too conjectural to meet the requirements of the work product doctrine. *See Weber*, 2003 WL 161340, at *3. And in the case of ICE, an agency frequently engaged in litigation over its policies and conduct, this logic would afford near-blanket protection to its otherwise discoverable or FOIA-responsive documents, so long as they happened to be prepared by an attorney. The Court declines ICE's invitation to permit the exception to swallow the rule. Independently, Defendants do not explain why these records, which involve the *implementation* of PEP, "would [not] have been created in essentially similar form irrespective of the [speculative] litigation." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998). And "[i]t is well established that work-product privilege does not apply to such documents." *Id.*

For all these reasons, the Court rejects Defendants' bid to claim the protection of the attorney work product doctrine.

**B.    Deliberative Memoranda**

The Court next considers the deliberative memoranda Defendants have withheld under the deliberative process privilege. These memoranda are each final (not draft) documents. At issue are four records from DHS and five records from ICE.

*a.    DHS Record Nos. 12, 13, 23, 25 and 125*

DHS Records 12 and 13 contain memoranda from CRCL regarding "civil rights monitoring of ICE transfers from state and local law enforcement agencies"; DHS Records 25 and 125 contain additional memoranda on the same subject, *see* DHS *Vaughn* Index, Record

20

Nos. 12 (policy proposals), 13 ("various policy proposals" that "were never adopted or implemented"), 25 (policy proposals), 125 ("policy recommendations").  In addition, one or more records contain "a draft MOU for CRCL and ICE to execute if th[e] policy proposal[s] were adopted."  *Id.*, Record Nos. 13, 25.  DHS Record No. 13 also includes an email which has been produced in full except for Personal Identifying Information ("PII"), the withholding of which Plaintiffs do not contest as to any record in this case.  Pl. Mem. at 7 n.5.  Parts of these five records were withheld pursuant to the deliberative process privilege.

Plaintiffs argue that because these memoranda were drafted after then-Secretary Johnson's memorandum announcing PEP, they must be "materials related to the explanation, interpretation or application of an existing policy, as opposed to the formulation of a new policy," *Davis I*, 2011 WL 1742748, at *2, and are therefore not covered by the deliberative process privilege.  Defendants counter that Johnson's Secure Communities and PEP memoranda did not represent the conclusion of the agency's policy-making regarding PEP.  Def. Opp'n at 9–10.

Defendants have the better of this argument.  The Secure Communities memo's discussion of the civil rights aspect of PEP merely provided that:

> DHS will monitor [the transfer of non-citizens to ICE custody] at the state and local level, including through the collection and analysis of data, to detect inappropriate use to support or engage in biased policing, and will establish effective remedial measures to stop any such misuses.  *I direct the Office of Civil Rights and Civil Liberties to develop and implement a plan* to monitor state and local law enforcement agencies participating in such transfers.

Secure Comm. Mem. at 3 (emphasis added).  It is clear that the monitoring policy had not been developed at the time of Johnson's memo, but instead needed to be developed in the months that followed.  Viewed in this light, the *Vaughn* entries for these records—each of which represents that the policy proposals contained in the memoranda "were never adopted or implemented by

DHS," DHS *Vaughn* Index, Record No. 12, 13, 25, 125—is sufficient for the Court to find that

the deliberative process privilege applies to at least some portions of these records. *See Sears*,

421 U.S. at 153 (deliberative process privilege "calls for disclosure of all opinions and

interpretations which embody the agency's effective law and policy, and the withholding of all

papers which reflect the agency's group thinking in the process of working out its policy and

determining what its law shall be." (internal quotation marks omitted)).[7]

That, however, does not end the analysis.  Although Defendants have established a basis

for withholding these records under Exemption 5, the *Vaughn* entries are insufficient to satisfy

the additional requirements of the FOIA Improvement Act.[8]  Under the Act, Defendants "must

explain how a *particular* Exemption 5 withholding would harm the agency's deliberative

process." *NRDC I*, 2019 WL 3338266, at *1 (emphasis added) (citation omitted).  An agency

must do more than demonstrate why a given record falls within an enumerated FOIA exemption.

Defendants must "specifically and particularly describes the Exemption 5-related interests that

would be harmed by disclosure of" *these* documents.  *Id.*

Defendants are therefore directed to submit copies of DHS Record Nos. 12, 13, 25, and

125 for the Court's *in camera* review.  Defendants are further directed to submit an affidavit

explaining the particular harm that would come from the production of these records, which, as

---

[7] Having found that Exemption 5 applies on this basis, the Court need not reach Defendants' additional argument that CRCL's memoranda will *always* qualify for withholding under Exemption 5 because it does not have final policymaking authority.  Def. Mem. at 20.  This argument, however, appears likely overbroad.

[8] Contrary to their assertion, it is Defendants that appear to "[m]isapprehend the [f]oreseeable [h]arm [s]tandard" created by the FOIA Improvement Act.  Def. Opp'n at 20–21.  Like other district courts in this District and the District of Columbia, this Court finds that the Act "imposes an independent and meaningful requirement on agencies before they may withhold a record under one of FOIA's exemptions."  *NRDC II*, 2019 WL 4142725, at *3.

Defendants repeatedly note, relate to a long-since discontinued enforcement program.[9]  *In camera* review will also serve to confirm Defendants' representation, to which the Court affords a presumption of good faith, that no additional segregable information has been withheld from them.

*b.    ICE Records*

The Court next reviews the five ICE memoranda that Defendants have withheld under the deliberative process privilege.

- **ICE Record No. 24**:  This record is titled "Executive Summary – Detainer Engagement Strategy" and has been withheld in full because "the document contains the employees' opinions and recommendations about actions and meetings that the agency should take to further PEP partnerships with state and local" LEAs and "contains proposals for agency action, which may not have been adopted."  ICE *Vaughn* Index, Record No. 24.  Based on this description, the Court finds that this memorandum regards the implementation or "or application of an existing policy"—PEP—"as opposed to the formulation of a new policy," and is therefore not covered by the deliberative process privilege.  *See Davis I*, 2011 WL 1742748, at *2.  This record therefore is not properly withheld under Exemption 5 and must be produced.

- **ICE Record No. 33**:  This record is "a one-page memo about the DHS detainer form (I-247) being replaced by the I-247D and I-247N."  ICE *Vaughn* Index, Record No. 33.  According to the *Vaughn* entry, it contains two redactions: "one section laying out two options for moving forward with the form rollout, and the recommendation by the paper author on new language for the forms."  *Id.*  The document is described as containing "pre-decisional and deliberative opinions and options for PEP form rollouts and language."  *Id.*  The Court finds that this record, too, relates to the implementation or "or application of an existing policy"—PEP—"as opposed to the formulation of a new policy," and is therefore not covered by the deliberative process privilege.  *See Davis I*, at *2.  This record is not properly withheld under Exemption 5 and must be produced.

---

[9] The Court advises Defendants that it unlikely to be persuaded by the argument, standing alone, that the public may be confused by the production of proposed but never-adopted DHS policies from nearly five years ago.

23

- **ICE Record No. 47**: The title of this document is "ERO – Detained Population – Prepared on: January 7, 2015" and, according to the *Vaughn* entry, it "summarizes ICE's detained population—specifically the decline in the number of [non-citizens] detained—and lays out multiple conjectures to potentially explain the decline" and "also contains proposals for next steps and strategies."  ICE *Vaughn* Index, Record No. 47.  The document was withheld in full.  To the extent it does not contain factual information, which is not covered by Exemption 5, *NRDC II*, 2019 WL 4142725, at *6, it appears to relate to the implementation "or application of an existing policy"—PEP—"as opposed to the formulation of a new policy," and is therefore not covered by the deliberative process privilege, *Davis I*, 2011 WL 1742748, at *2.  This record is not properly withheld under Exemption 5 and must be produced.

- **ICE Record No. 71**:  This record is titled "ERO – PEP Implementation Strategy – Highlights" and "sets out recommendations and proposed future actions from ERO on how to more smoothly transition ICE field offices to PEP."  ICE *Vaughn* Index, Record No. 71.  The document was withheld in full.  By its own terms, and as confirmed by the *Vaughn* entry, it pertains to the implementation or "or application of an existing policy"—PEP—"as opposed to the formulation of a new policy," and is therefore not covered by the deliberative process privilege. *See Davis I*, 2011 WL 1742748, at *2.  This record is not properly withheld under Exemption 5 and must be produced.

- **ICE Record No. 76**: This record is titled "New York City: Form I-247 (November 5, 2015)" and contains "two copies of [a] 3-page document [that] gives background on New York City's inability to cooperate with PEP due to city laws.  The document [sets] out proposed actions that can assist in maintaining immigration enforcement and optimizing officer safety.  The document is marked [*inter alia*] 'Deliberative' in the footer."  ICE *Vaughn* Index, Record No. 76.  According to the *Vaughn* entry, it is "a deliberative document compiled by ICE to assist agency leadership in making official decisions regarding LE[A] partnerships in New York City . . . .  As such, it contains . . . information such as background information, recommendations for next steps, and points of contact for further engagement regarding PEP."  *Id.*  The document was withheld in full. The document's factual "background information" is not covered by Exemption 5.  *NRDC II*, 2019 WL 4142725, at *6.  And this record otherwise appears to relate to the implementation or "or application of an existing policy"— PEP in New York City—"as opposed to the formulation of a new policy," and is therefore not covered by the deliberative process privilege, *Davis v. City of New York*, 2011 WL 1742748, at *2.  As with other records discussed in this decision, the label affixed to the document is not controlling.  This record is not properly withheld under Exemption 5 and must be produced.

24

For the foregoing reasons, each of these five records must be produced to plaintiffs in full.

## C.      Talking Points

The Court next considers Defendants' argument that various records containing "talking points" relating to PEP are protected by the deliberative process privilege.  Plaintiffs argue that such documents are necessarily post-decisional, and not deliberative, and must be released. Defendants counter that although the documents post-date Johnson's announcement of PEP, they are pre-decisional with regard to the distinct "messaging" decisions of how to communicate about PEP to the public or stakeholders.

The Second Circuit has not squarely addressed this issue,[10] and courts in this District have resolved the question differently.  *See New York v. U.S. Dep't of Com.*, No. 18 Civ. 2921 (JMF), 2018 WL 4853891, at *1–2 (S.D.N.Y. Oct. 5, 2018) (collecting cases); *Seife*, 298 F. Supp. 3d at 614–15 (collecting cases).  Broadly speaking, courts that have taken the position espoused here by Plaintiffs have concluded that "'messaging' is no more than an explanation of an existing policy, which is not protected by the deliberative process privilege" and held that "[d]eliberations about how to present an already decided policy to the public, or documents designed to explain that policy to—or obscure it from—the public . . . are at the heart of what should be released under FOIA."  *See e.g.*, *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, ("*NDLON I*"), 811 F. Supp. 2d 713, 741 (S.D.N.Y. 2011),

---

[10] In *American Civil Liberties Union v. Department of Justice*, 844 F.3d 126 (2d Cir. 2016), the Second Circuit held that the deliberative process privilege applied to "a draft of a proposed [but never published] op-ed article that suggested some ways of explaining the Government's legal reasoning in support of drone strikes," because it was a draft and "for that reason predecisional." *Id.* at 133.  The Circuit's three-sentence treatment of that document did not address, let alone resolve, the split between the cases discussed here, and the Court declines to read the decision as definitively resolving this doctrinal debate.

*amended on reconsideration* (Aug. 8, 2011); *see also Fox News Network, LLC v. U.S. Dep't of the Treasury*, 739 F. Supp. 2d 515, 545 (S.D.N.Y. 2010) (holding that "communications regarding how to present agency policies to Congress, the press, or the public, while deliberative, typically do not relate to the type of substantive policy decisions Congress intended to enhance through frank discussion" and, similarly, "opinions and recommendations regarding press inquiries do not qualify as deliberations about substantive policy decisions").  Other courts in this District, however, have found persuasive the reasoning of district courts in the District of Columbia, and of the First Circuit, holding that "draft talking points, anticipated questions and proposed answers, and other documents reflecting deliberations about *how* to present an agency's policy to the public are entitled to the protection of the deliberative process privilege." *See Seife*, 298 F. Supp. 3d at 615 (emphasis added); *see also, e.g.*, *N.H. Right to Life v. U.S. Dep't of Health & Hum. Servs.*, 778 F.3d 43, 54 (1st Cir. 2015); *Sierra Club v. U.S. Dep't of Interior*, 384 F. Supp. 2d 1, 19 (D.D.C. 2004).  These courts reason that:

> an agency's decision regarding how to present its substantive policies to the public often involves the evaluation of alternative public relations policies, policies which by their very nature are audience-sensitive and must anticipate public reaction.  Even when an underlying decision or policy has already been established by the agency, the decision of how, and to what extent, to convey that policy to the public may require input by many working components within the agency, or even an analysis of the underlying policy itself.

*Seife*, 298 F. Supp. 3d at 616 (internal quotation marks and citation omitted).

The Court agrees with Judge Furman's assessment in *New York* that the appropriate line for the disclosure of talking points lies between these two positions.  On the one hand, "the Government goes too far in suggesting that *all* deliberations over what to say are protected by the privilege.  [Taken] to its logical conclusion, that suggestion would render the privilege's restriction to 'predecisional' deliberations a nullity because, [as] agencies are in constant communication with the public, the press, and Congress, *all* 'messaging' deliberations would be

'predecisional' with respect to some future messaging 'decision.'" *New York*, 2018 WL 4853891, at *2. Such broad protection for messaging decisions about otherwise decided-upon policy would severely undercut FOIA's overarching presumption of disclosure and sweep far broader than the policy rationales of the deliberative privilege process. On the other hand, "an agency's decisions about what and how to communicate with Congress, the press, or the public can"—in some circumstances—"involve substantive policymaking (or at least substantive policy refinement) of the type that Congress has delegated to the agency, and the purposes of the privilege are served by protecting the deliberations leading to those decisions." *Id.* This reality counsels against a rule either categorically exempting, or categorically protecting, talking points and similar documents with the deliberative process privilege. *Accord Seife*, 298 F. Supp. 3d at 616; *New York*, 2018 WL 4853891, at *2.

This Court accordingly finds that "where 'messaging' communications amount to little more than deliberations over how to spin a prior decision, or merely reflect an effort to ensure that an agency's statement is consistent with [a] prior decision, protection would do little to advance the purposes underlying the [deliberative process] privilege." *New York*, 2018 WL 4853891, at *2. This reasoning easily extends to communications about existing policy decisions to various stakeholders. "After all, what FOIA requesters are frequently seeking is evidence of discrepancies between what their government is saying versus what it is doing, or what it is saying in public versus what it is saying behind closed doors. This is the type of concern that FOIA seeks to vindicate, and discussions about proper 'messaging' will often be quite revealing." *NDLON I*, 811 F. Supp. 2d at 741. But where "communications are of a nature that they would reveal the deliberative process underlying a not-yet-finalized policy decision," *New York*, 2018 WL 4853891, at *2, or a not-yet- announced policy decision, deliberations about

what message to deliver, and how to go about doing so, can fall within the protections of the deliberative process privilege.

Having set out the applicable legal framework, the Court now considers the records withheld by DHS, CBP, and ICE based on their status as talking points.

   *a.*  *DHS Talking Points*

DHS has withheld 21 records because they are talking points. Four such records bear an identical description in the *Vaughn* index:

> This document contained draft talking points for reference in the DHS leadership's meetings with state and local partners. This document reflects draft issues for DHS leadership's consideration, but not the final content of what was discussed or determined at the meeting. These talking points were prepared in connection with on-going negotiations with state and local authorities in the hopes of entering into agreements with those authorities. The agency had not entered into those agreements at the time the talking points were prepared. Release of any portion of the draft correspondence would allow the public to determine the substance of proposed points of discussion as opposed to what was actually communicated to state and local authorities. Release of these draft materials would intrude upon the ability to provide candid and robust ideas for consideration by decisionmakers because it would subject tentative proposals and recommendations to public scrutiny. Additionally, releasing the draft version would pose a substantial risk of confusing the public as the draft talking points do not represent final DHS positions, which may conflict with this language.

DHS *Vaughn* Index, Record Nos. 2, 5, 6, 7. Seven more records contain the same description above but also contain the following language (the "Circulated Draft" language): "[T]his is a draft circulated for additional input and comments from DHS components, including deliberative redlines and edits to the content. Release of this information would intrude upon the editorial process and stifle the exchange of ideas and candid discussions within the DHS." *Id.*, Record Nos. 1, 3, 4, 14, 15, 16, 17.

Setting aside for now the Circulated Draft language, addressed below, these 11 records consist of talking points used for meetings with various stakeholders—state or local elected officials, members of their administration, or members of state and local law enforcement—

about PEP.  *See Id.*, Record Nos. 2, 3, 4, 14, 15, 16, 17 (governors, mayors, city council

members); *id.*, Record No. 1 (L.A. city attorney); *id.*, Record Nos.  5, 6, 7 (law enforcement).[11]

According to the *Vaughn* entries, these meetings were aimed at winning buy-in from these

stakeholders for PEP.  The Court finds that the messaging materials contained in these 12

records—DHS Record Nos. 1, 2, 3, 4, 5, 6, 7, 10, 14, 15, 16, 17—are not protected by the

deliberative process privilege.  They are squarely in service of communicating, and perhaps

spinning, an existing policy decision to various stakeholders who were needed to make the PEP

program a success.  They must be produced as discussed below.

The Court reaches a similar conclusion as to DHS records described as "remarks" on

"executive action on immigration," *id.*, Record Nos. 101, 102, 119, or "DHS activity in 2015,"

*id.*, Record No. 121.  If anything, the argument for disclosing such talking points is heightened

where the "remarks" were made to an audience as opposed to in small or private meetings.

These records must also be produced.

Two additional records are described substantially similarly in the *Vaughn* Index to the

records discussed above, except that in both cases the document was marked "draft."  *See id.*,

Record Nos. 98 (record contains "remarks (marked draft) for reference in the DHS leadership's

meetings with state and local partners"), 100 (record contains "talking points (marked draft) for

reference in the DHS leadership's meetings with state and local partners").  As with the other

records discussed in this decision, the label affixed to the record, here "Draft," is not dispositive.

Nor is the Court persuaded by the argument, advanced repeatedly in the DHS *Vaughn* Index, that

nearly *all* of the talking points at issue in this litigation should be considered drafts because they

---

[11] The *Vaughn* entry for another record, DHS Record No. 10, largely tracks this language except
that the talking points were for "CRCL meetings with non-governmental organizations."  *Id.*,
Record No. 10.

"reflect[] draft issues for DHS leadership's consideration, but not the final content of what was discussed or determined at the meeting," and because "release of any portion of the draft correspondence would allow the public to determine the substance of proposed points of discussion as opposed to what was actually communicated to state and local authorities." *See, e.g.*, DHS *Vaughn* Index, Record Nos. 1–7.  Such a broad definition of "draft" would preclude the release of anything short of a transcript of these meetings, which of course do not exist. Based on the *Vaughn* Index, these "drafts" were as close to final as ever existed, and they are not protected by the deliberative process privilege.  Thus, DHS Records 98 and 100 must also be produced.

A closer question is presented by those records which include the Circulated Draft language.  The *Vaughn* entries for these records state, in relevant part, that "this is a draft circulated for additional input and comments from DHS components, including deliberative redlines and edits to the content."  It is not pellucid whether the records at issue here in fact contain "deliberative redlines and edits to the content," or if instead they were circulated for additional input, which may have included redlines and edits, but any such feedback, if in fact received, is not revealed on these records.  If the former, that the records were circulated for feedback, and that such feedback may have included markups, is not relevant to the question of whether these documents should be produced.  If, on the other hand, these records themselves contain markup, they are properly withheld as drafts under Exemption 5, as discussed *infra*.

Counsel for Defendants are therefore directed to file a sworn affidavit on the docket within 30 days of this Opinion stating whether any of these records—specifically, DHS Record Nos. 1, 3, 4, 14, 15, 16, 17, 98, 100—contain "deliberative redlines" or other markup on the face

of the record.  If they do, they are properly withheld as drafts.  *See infra*.  To the extent they do not, however, they must be produced to Plaintiffs.

Finally, the Court considers three DHS records containing talking points that have significantly different *Vaughn* entries than those discussed so far:

- **DHS Record No. 31**: This record is titled "PEP Monitoring TPs" and was partially redacted.  According to the *Vaughn* index, the redacted portions "contain draft talking points and discussions regarding ongoing draft DHS policy development.  Release of any portion of the draft correspondence would allow the public to determine the substance of proposed points of discussion as opposed to the policies actually adopted by DHS."  *Id.*, Record No. 31.  This description supplies an inadequate basis for the Court—having rejected the argument that a document containing Talking Points is *per se* covered by the deliberative privilege process—to find that this record is so protected.  This record must be produced.

- **DHS Record No. 110**: This record is titled "Talking Points to assist Interview re PEP" and, according to the *Vaughn* entry, contains "draft talking points for reference in the DHS leadership's engagements with the public.  This document reflects draft issues for DHS leadership's consideration, but not the final content of what was discussed or determined at the meeting."  *Id.*, Record No. 110.  As with DHS Record No. 31, this description does not establish that these talking points are protected by the deliberative process privilege.  This record must be produced.

- **DHS Record No. 124**: This record is a November 18, 2015 email with the subject line "FW: Exec Action Anniversary Blog" and is partially redacted.  *Id.*, Record No. 124.  In addition to redactions of personal identifying information, which Plaintiffs do not contest, the record contains redactions of "proposed courses of action regarding public messaging and draft language for review and are deliberative and predecisional in nature."  *Id.*  To the extent this record would reveal *deliberations* about how to communicate with the public regarding PEP, instead of agreed upon talking points, it may be protected by the deliberative privilege process.  Defendants are directed to submit this record to the Court for *in camera* inspection.

    b.    *Talking Points Withheld by CBP*

The Court next considers the one record withheld by CBP on the basis that it contains protected talking points.  CBP Record No. 3 is titled "Draft remarks by the CPB commissioner for Major Cities Chiefs Association in June 2015" and contains "draft talking points for reference by CBP leadership in meetings with state and local partners."  CBP *Vaughn* Index,

Record No. 3.  This record is not protected by the deliberative process privilege for the same

reasons as the similarly described DHS records discussed above.  However, this record also

contains the Circulated Draft language.  Counsel for Defendants should therefore, in their sworn

affidavit, discussed *supra*, state whether CBP Record No. 3 contains "deliberative redlines" or

other markup on the face of the record.  If it does not, it must be produced.

c.    *Talking Points Withheld by ICE*

The Court next considers documents withheld by ICE as talking points.  At the outset, the

Court finds that nine records—ICE Record Nos. 4, 7, 10, 12, 13, 14, 16, 18, 19—although

containing talking points, are better categorized as "Drafts" because they include redlines,

comment bubbles, or other markup.  The Court will therefore address these records *infra*, along

with the other documents withheld on the basis of being "drafts."  The Court addresses the

remaining ICE talking points records—ICE Record Nos. 1, 2, 3, 17, 29, 30, 55, 66—in turn:

- **ICE Record No. 1**: This record is titled "IP #51: ICE Detainers – Cooperation with State and Local Authorities" and are "draft talking points" "prepared by the Deputy Chief of Staff for ICE [ERO]" "for an unknown member of ICE senior leadership."  ICE *Vaughn* Index, Record No. 1.  According to the *Vaughn* entry, the "talking points contain specifics about the PEP program, but also contain the 'perceptions' of ERO Field Office Directors ('FODs') regarding local authority compliance with ICE detainers.  The document also contains information about potential new policies with state and local law enforcement to further enforce ICE's mission."  *Id.*  The entire record has been withheld as "a deliberative draft document from an ICE employee related to PEP that contains pre-decisional and deliberative information such as recommendations or opinions."  *Id.* There is no basis to find that this is in fact a "draft" document, however.  And by virtue of being talking points, it is reasonable to infer that the views expressed within the document were intended to be shared by the "unknown member of ICE senior leadership" with someone else.  On the basis of the *Vaughn* entry, there is no basis to find that these talking points contain deliberations, whether about how to present a message or about what the message ought to be.  These talking points must therefore be produced.
- **ICE Record No. 2**: This record is titled "CAP [Criminal Alien Division of the ERO] / OPLA [Office of the Principal Legal Advisor] Talking Points for Priority Enforcement Program" and contains "draft [talking points] notes for any ICE employee giving a

32

presentation to the field on PEP." *Id.*, Record No. 2.  It is marked, *inter alia*, "draft" and "deliberative" and contains "highlighting over some portions of text." *Id.*  The Court has already found that attorney-client privilege and the work product doctrine do not apply to this record. *See supra*.  Although the *Vaughn* entry conclusorily asserts that the record "contains pre-decisional and deliberative information" and is a draft document, it does not furnish any concrete basis on which to find that either of these things is so, and the document's labeling as such is insufficient.  The Court therefore directs that a version of this document—with the highlighting removed—be produced.

- **ICE Record No. 3**: This record is titled "Priority Enforcement Program" and contains "[talking points], background, current status reports, future requirements, enforcement priorities, and Q&As" for an unknown audience. *Id.*, Record No. 3.  The document is described as "a deliberative draft document from ICE employees and/or attorneys related to PEP" that "contains opinions and recommendations on future immigration enforcement actions and the immigration court system."  The Court has already found that attorney-client privilege and work product doctrine do not apply to this record. *See supra*.  There is no basis to find that this document is either pre-decisional or deliberative.  The deliberative process privilege therefore does not apply to this record and it must be produced.

- **ICE Record No. 17**: This record is titled "Family Residential Center Press Release / ICE Actions – Side-by-Side" and contains "a side by side graph comparing the text of an ICE press release with the corresponding ICE action being taken, along with deadlines and/or status updates for each action." *Id.*, Record No. 17.  It is marked as a "draft" and contains "incomplete sections/sentences." *Id.*  According to the *Vaughn* entry, it also contains "aspirational opinions and recommendations for future meetings and actions regarding PEP."  There is no information about the author of the document or the intended recipients.  This document may qualify for the deliberative process exemption, or it may be unprotected materials relating to the "application of an existing policy," *i.e.*, PEP.  The Court directs that this record be submitted to the Court for *in camera* review.

- **ICE Record No. 29**: This record is titled "Meeting with Mayor De Blasio – March 15, 2016" and is a "a briefing paper for Secretary Johnson" that "lays out issues for a follow up meeting regarding PEP and funding for the Urban Areas Security Initiative (a FEMA based program)" and further contains "pre-decisional and deliberative opinions about PEP, public safety in New York City, and proposals for future partnerships between New York city and ICE." *Id.*, Record No. 29.  The *Vaughn* entry further states that "[t]he document also contains information about other DHS programs, such as the Urban Areas Security Initiative and testing involving the DHS Science and Technology Directorate; ICE lacks knowledge as to the deliberative or pre-decisional nature of these discussions, but those sections contain future proposals and budgetary concerns." *Id.*  The document has been withheld in full.  Parts of this record, including "purely factual material," "materials related to the explanation, interpretation or application of" PEP, and talking

33

points, may not be protected by the deliberative process privilege.  *See Davis I*, 2011 WL 1742748, at *2.  The Court directs that this record be submitted to the Court for *in camera* review.

- **ICE Record No. 30**: This record is titled "Meeting with Mayor De Blasio – April 3, 2016" and is "a briefing paper for Secretary Johnson" "relating entirely to immigration legislation and PEP."  *Id.*, Record No. 30.  It "contains pre-decisional and deliberative opinions about PEP, public safety in New York City, and proposals for future partnerships between New York [C]ity and ICE."  The record has been withheld in full as predecisional and deliberative.  It is unclear, however, whether the "proposals" in this record relate to the implementation of PEP—*e.g.*, an MOU with New York City—or some new policy initiative.  The latter would likely be covered by the deliberative process privilege, although that would not be a basis to withhold the entire record.  The Court therefore directs that this record, too, be submitted for *in camera* review.

- **ICE Record No. 55**: This record is titled "Talking Points for PEP" and contains "draft talking points outline what PEP is, the removal priorities, the difference between PEP and Secure Communities, and include[s] [a] PEP implementation timeline from May 6, 2015."  *Id.*, Record No. 55.  It discusses "PEP [and] how it differs from the previous program Secure Communities."  This document clearly contains explanatory talking points about PEP and its implementation.  It is not protected by the deliberative process privilege and must be produced.

- **ICE Record No. 66**: This record is titled "NYC PEP Discussion – January 11, 2016" and was "prepared by a member of the DHS Deputy Secretary's staff in preparation for a meeting with leaders from New York City" that "focused on ICE arrests at sensitive locations like courthouses and locations offering social services."  *Id.*, Record No. 66.  The *Vaughn* entries explain that "[t]hese issues had to be resolved for NYC to sign an MOU with ICE," and the document "lay[s] out potential questions or issues that will be asked of DHS leadership, along with several ways to respond based on the tone of the conversation."  *Id.*  Although deliberations about how to address stakeholder concerns may be protected by the deliberative process privilege, this record appears to contain the final, agreed-upon talking points to use in explaining the PEP program and persuading New York City to participate in PEP.  The record is therefore not covered by the deliberative process privilege and must be produced.

### D.    Emails

The Court next turns to emails withheld by DHS.  Although the contents of an email are not presumptively protected by the deliberative process privilege, email messages that contain

deliberative content—the "give-and-take of the consultative process," *Brennan Ctr.*, 697 F.3d at 202—may properly be withheld.

Here, the Court finds that the following DHS records are properly withheld as deliberative:  DHS Record No. 32 ("discussions regarding the content of a draft report for DHS leadership.  The redacted sections do not contain actual data, only discussion of the appropriate content for a future document."); DHS Record Nos. 35–37, 38, 39 ("discussions regarding possible edits" to an in-progress DHS memo); DHS Record Nos. 45, 47 ("commentary on an unsigned deliberative recommendation memo marked draft" (these two emails are also properly withheld as drafts because they contain redline edits)); DHS Record Nos. 49–59, 61, 63–78, 82, 84–87, 90 ("discussions regarding possible edits to a draft memo"); DHS Record No. 62 ("draft discussions regarding possible DHS outreach language in coordination with CRCL and ICE," *i.e.*, how to present a message); DHS Record No. 89 ("discussions regarding possible edits to [DHS Record] 88"); DHS Record No. 93 ("discussions of edits to [DHS Record No. 94]"); DHS Record Nos. 96, 99 ("draft correspondence *with edits* for DHS internal review" (emphasis added)).[12]

Other emails, however, appear clearly to relate to "the explanation, interpretation or application of an existing policy, as opposed to the formulation of a new policy" and are not covered by the deliberative process privilege.  *Davis v. City of New York*, 2011 WL 1742748, at *2.  Thus, the following records must be produced: DHS Record No. 48 (redaction of "a deliberative memo discussing *implementation* options for the PEP program" (emphasis added));

---

[12] In addition, the Court notes that six emails have been released except for the redaction of personal identifying information, which Plaintiffs do not contest: DHS Record Nos. 42, 43, 79 105, 107 and 113.

DHS Record No. 80 (redaction of "a single line of pre-decisional discussions on policy approaches regarding *implementation* of PEP" (emphasis added)); DHS Record No. 81 (redaction of "two lines of pre-decisional discussions on policy approaches regarding *implementation* of PEP" (emphasis added)); DHS Record No. 95 ("discussions of recommendations for DHS leadership on possible modifications to existing *procedures*" (emphasis added)); DHS Record No. 111 ("discussions regarding possible changes to a schedule for actions by DHS officials"); DHS Record No. 115 ("draft proposed schedule for meetings with state and local partners").

Finally, the *Vaughn* entries for five emails leave it unclear whether some of the contents are properly withheld pursuant to the deliberative process privilege.  The Court therefore directs Defendants to submit the following records for *in camera* inspection: DHS Record Nos. 40, 41, 46, 92, and 117.

### E.    Draft Documents

Finally, the Court considers the remaining 110 records at issue.  They have been withheld solely on the ground that they are "drafts."  As discussed above, to qualify for protection under the deliberative process privilege, a record must be "(1) pre[-]decisional, *i.e.*, prepared in order to assist an agency decision[]maker in arriving at his decision, and (2) deliberative, *i.e.*, actually related to the process by which policies are formulated."  *Adelante Ala. Worker Ctr.*, 376 F. Supp. 3d at 356 (internal quotation marks omitted).

The *Vaughn* entries for a subset of these records indicate that the records include redline edits in the form of track changes and/or comment bubbles, or in-line comments.  The Court has no difficulty finding that such records are protected by the deliberative process privilege—they represent a snapshot in time of the "agency's group thinking in the process of working out its policy and determining what its law shall be."  *Sears*, 421 U.S. at 153 (internal quotation marks

omitted).  The Court therefore upholds the withholding of the following records: DHS Record

Nos. 9, 18, 20, 29, 45, 47, 83, 88, 91, 97, 112; ICE Record Nos. 4, 5, 6, 7, 9, 10, 11, 12, 13, 14,

15, 16, 18, 19, 21, 22, 23, 25, 26, 27, 43, 45, 54, 58, 89.

The Court similarly finds that several other records are properly considered draft

documents protected by the deliberative process privilege.  This includes four draft, unsigned

Memoranda of Understanding, DHS Record Nos. 26, 28, 60; ICE Record No. 28, a proposed

updated Directive "that was never finalized or signed" and never became ICE policy, ICE

Record No. 57, and five drafts for which a later or final version has been produced or is publicly

available, DHS Record No. 30; ICE Record Nos. 38, 39, 53, 81.  Also properly withheld as drafts

are three records that include blank sections, placeholders, and the like: ICE Record Nos. 20, 73, 84.

The Court next finds that several records are protected by the deliberative process

privilege because they are both pre-decisional and deliberative, presenting various options for the

adoption of policy.  The following records are properly withheld on this ground: ICE Record

No. 31 (described by the author as "a compilation of thoughts after hearing comments from so

many forums [various agencies and employees]" (alteration in original)); ICE Record No. 69

("proposes a realignment of ERO's enforcement resources and targeting practices to address the

new enforcement priorities under PEP"); ICE Record No. 59 (memo updating "the Deputy

Secretary on the differing positions taken by CRCL and ICE regarding civil rights complaints

and concerns arising from PEP" that sets "forth various agency positions on various topics and

then proposes potential paths forward and/or leadership decision points on key issues that lack

consensus between ICE and CRCL").

The Court next considers records containing draft versions of the forms used to

implement PEP.  Although in one respect such forms epitomize the implementation of the

existing PEP policy, the Court views iterative drafts of such forms as more aptly viewed as drafts reflecting the "agency's group thinking in the process of working out its policy." *Sears*, 421 U.S. at 153 (internal quotation marks omitted). The Court therefore finds that the following records are protected by the deliberative process privilege: CBP Record Nos. 1, 4; DHS Record Nos. 21, 22, 23, 24, 27, 34, 44, 94; ICE Record Nos. 78, 79, 85, 86, 34 (to the extent individual pages within this record contain redline edits, those pages are properly withheld on that basis as well). The Court reserves on whether these records are properly withheld in light of the FOIA Improvement Act, however. Defendants are directed to submit an affidavit explaining in more detail the harm that would come from the release of these draft forms for the discontinued PEP program which are, at this point, arguably historical records. As to this issue, Defendants may address these records collectively.

Finally, the *Vaughn* entries for the following records are too vague to allow the Court to determine whether they are properly withheld under the deliberative process privilege. The Court therefore directs Defendants to submit the following records for *in camera* inspection: DHS Record Nos. 104, 118, 122, and 123; ICE Record No. 46.

The remaining records are not protected by the deliberative privilege for the following reasons:

- The *Vaughn* entries for the following records reveal that they are primarily factual in nature, and are therefore not protected by the deliberative process privilege: ICE Record No. 8 ("information and statistics about which counties are accepting detainers and which are not, and what forms (i.e., I-247D, I-247N) that the counties accept"); ICE Record No. 36 ("number of jurisdictions failing to honor ICE detainers, the number of individuals released as a result, delineated by ICE priority category, and the number of such individuals remaining at large"); ICE Record No. 70 (same); ICE Record No. 60 ("chart" detailing "what laws or policies have been passed regarding ICE detainers, broken down by state and ICE Area of Responsibility [("AOR")]"); ICE Record No. 77 (same). These records must be produced.

38

- The *Vaughn* entries for the following records reveal that they are messaging documents focused on communicating existing policy regarding, and/or the implementation of, PEP, frequently with the aim of encouraging state and local LEAs to sign on to the PEP program. Because they are not deliberative—they are not concerned with which message to present, or how to present it—they are not protected by the deliberative process privilege: ICE Record No. 35 (letter to local LEA "outlines the new PEP priorities, the new detainer forms, and the authority of ICE officers under the law"); ICE Record No. 61 ("letter explains the PEP program and urges the city to reconsider the New Orleans Police Department's new policy on immigration that ICE feels stymies their enforcement mission"); ICE Record No. 75 ("internal" "FAQ" that "lays out answers on such topics as the enforcement priorities, information for people who believe their detainer or priority demarcation is erroneous, prosecutorial discretion, and what the definitions in the priorities mean"); ICE Record No. 67 (draft letter "concerns the differences between PEP and Secure Communities and mentions the Boston AOR"); ICE Record No. 65 (draft letter "answering some questions about PEP and the various new detainer forms"); ICE Record No. 37 ("draft letter template, meant to be sent from the heads of ERO field offices to local law enforcement to seek partnerships in the new PEP program"); ICE Record No. 72 ("letter template, to be sent to state and local law enforcement by the DHS Assistant Secretary for State and Local Law Enforcement, discusses PEP and calls for partnership with ICE"); ICE Record No. 74 (same); DHS Record No. 116 ("draft frequently asked questions relating to executive action on immigration"); DHS Record No. 11 ("draft language for review by DHS components for a template of letters from the Office of the Secretary to state and local jurisdictions"); DHS Record No. 19 (same); DHS Record No. 33 (same); DHS Record No. 108 (same); DHS Record No. 109 (same).

- The *Vaughn* entries for the following records reveal that they are primarily focused on the implementation of PEP, and are therefore not protected by the deliberative process privilege: ICE Record No. 40 ("document summarized various theories as to why ICE's detained population decreased between FY13 and FY15. It contains proposals for next steps and strategies"); ICE Record No. 41 (briefing summary for DHS Secretary on "how CRCL would monitor state and local LE cooperation with ICE enforcement operations in jails and prisons, with proposals on how to best move forward"); ICE Record No. 42 (memo addresses 'the roll out of the [civil rights] monitoring steps called for in PEP" and "lays out potential issues to comprehensive monitoring and how to address those shortfalls"); ICE Record No. 52 (same and also includes the "implementation plan"); ICE Record No. 48 ("details the rollout plan to local and state [LEAs] for PEP," "summarizes past coordination actions taken by these offices," and discusses "actions ICE and DHS should take to boost LE[A] partner engagement on PEP"); ICE Record No. 50 ("draft memo for all ICE and CRCL personnel" that "sets out how CRCL and ICE will address civil rights complaints following arrests by local LE agencies" "broken down into sections about identifying complaints or potential civil rights issues, and then procedures

for handling the complaints"); ICE Record No. 51 ("document details the CRCL
implementation plan for monitoring local LE agencies for improper or biased policing
practices"); ICE Record No. 80 (presents "several proposals for the roll-out" of Form
I-247x, includes "estimated timelines, various considerations and potential issues that
could arise during the roll-out," "recommends a timeline to leadership," and addresses
"potential issues that could occur during the rollout"); ICE Record No. 83 (three memos
that "set out how CRCL and ICE will address civil rights complaints following arrests by
local" LEAs); ICE Record No. 68 ("discusses how ICE will lead efforts to implement
new civil immigration enforcement priorities and guidance on prosecutorial discretion"
including "broad goals and proposed actions for consideration"); ICE Record No. 32
("outlines the role of unaccompanied children in enforcement of removal orders and
"contains three sections: Introduction; Logistical Issues with Removal of Minors; and
Risks Associated with Enforcement Actions"); ICE Record No. 44 ("details which
jurisdictions are working with PEP detainers and which are not" and "contains notes on
where various agencies have engaged with local" LEAs); ICE Record No. 49 ("document
prioritizes 15 jurisdictions that are not cooperating with ICE detainers, detailing any laws
or policies have been passed regarding ICE detainers and number of detainers denied"
and "includes PEP background and elected officials for the prioritized jurisdictions" as
well as "background information, recommendations for next steps, and points of contact
for further engagement regarding PEP"); ICE Record No. 56 ("summarizes, in bullet
points, various jurisdictions that ICE and/or DHS have engaged with to form
partnerships, and the outcome of that outreach" and includes "background information,
recommendations for next steps, and points of contact for further engagement regarding
PEP"); ICE Record No. 62 ("details which jurisdictions are working with PEP detainers
and which are not.  It contains notes on where DHS has engaged with local" LEAs and
includes "background information and points of contact for further engagement regarding
PEP"); ICE Record No. 63 (same); ICE Record No. 88 ("guidance for the [u]se of the
Form I 247X" that "instruct[s] an unknown audience on when and how immigration
detainer[ forms] are to be used for both priority aliens (i.e., I-247D and I-247N forms)
and non-PEP priority aliens (i.e., I-247X form)"); ICE Record No. 82 ("details every
single engagement activity taken by DHS and actions to be taken by DHS to engage with
state and local LE partners.  It contains suggestions for future meetings and engagement
technique[s]" and includes "background information, recommendations for next steps,
and points of contact for further engagement regarding PEP"); ICE Record No. 64
("document that meticulously details the outreach . . . that ERO has taken in various U.S.
cities, as well as each ERO field office's proposals for net steps" and includes
"background information and points of contact for further engagement regarding PEP");
ICE Record No. 87 ("specific suggestions on strategies that might get the area in question
to participate in PEP, such as targeted meeting or using current events to illustrate how
PEP can promote public safety").

## CONCLUSION

For the foregoing reasons, the Court grants partial summary judgment to Plaintiffs and directs Defendants to produce, in full, the following documents to Plaintiffs within 30 days:

- DHS Record Nos. 2, 5, 6, 7, 11, 19, 31, 33, 48, 80, 81, 95, 101, 102, 108, 109, 110, 111, 115, 116, 119, 121;
- ICE Record Nos. 1, 2, 3, 8, 24, 32, 33, 35, 36, 37, 40, 41, 42, 44, 47, 48, 49, 50, 51, 52, 55, 56, 60, 61, 62, 63, 64, 65, 66, 67, 68, 70, 71, 72, 74, 75, 76, 77, 80, 82, 83, 87, 88.

For the foregoing reasons, the Court grants partial summary judgment to Defendants and upholds the withholding of the following documents:

- DHS Record Nos. 9, 18, 20, 26, 28, 29, 30, 32, 35, 36, 37, 38, 39, 45, 47, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 93, 96, 97, 99, 112;
- ICE Record Nos. 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 25, 26, 27, 28, 31, 38, 39, 43, 45, 53, 54, 57, 58, 59, 69, 73, 81, 84, 89.

The Court reserves on the remaining documents and directs Defendants to take the following action within 30 days:

1) Defendants are directed to submit two copies of each of the following records—one unredacted and the other showing the proposed redactions—to the Court under seal for *in camera* review:

   a. DHS Record Nos.: 40, 41, 46, 92, 104, 117, 118, 122, 123, 124;

   b. ICE Record Nos.: 17, 29, 30, 46.

2) Defendants are directed to submit two copies of each of the following records—one unredacted and the other showing the proposed redactions—to the Court under seal for *in camera* review, along with an affidavit or revised *Vaughn* index identifying the specific harm that would come from the production of the following records: DHS Record Nos.: 12, 13, 25, 125.

3) Defendants are directed to submit an affidavit explaining the specific harm that would come from the production of the draft forms: CBP Record Nos. 1, 4; DHS Record Nos. 21, 22, 23, 24, 27, 34, 44, 94; ICE Record Nos. 34, 78, 79, 85, 86.

4) Defendants are directed to submit a sworn affidavit stating whether any of the following records contain deliberative redlines or other markup on the face of the record: DHS Record Nos. 1, 3, 4, 10, 14, 15, 16, 17, 98 100; CBP Record No. 3.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 164 and 173.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: September 14, 2020
      New York, New York